UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE ACADIA PHARMACEUTICALS INC. SECURITIES LITIGATION

Case No.: 18-cv-01647-AJB-BGS

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**(Doc. No. 88)**

Pending before the Court is Defendants' motion to dismiss Plaintiff's second amended complaint involving securities-fraud. (Doc. No. 88.) Having carefully considered the parties' arguments and moving papers, the law, material appropriately incorporated by reference and judicial notice, and for the reasons set forth herein, the Court **GRANTS** Defendants' motion to dismiss.

## I. BACKGROUND

### A. Factual Background

This case involves a class of individuals who acquired ACADIA securities between April 29, 2016, and July 9, 2018, and are suing Defendants—Acadia Pharmaceuticals Inc. ("Acadia"), and individuals Stephen R. Davis ("Davis"), Todd S. Young ("Young"), Srdjan Stankovic ("Stankovic"), Terrance Moore ("Moore"), and Michael Yang ("Yang")

(collectively, "Individual Defendants")—for violations of the Securities Exchange Act of 1934.

Plaintiff represents a class of those who acquired Acadia securities between April 29, 2016 and July 9, 2018, and who are suing under the Securities Exchange Act of 1934. (Doc. No. 77 at ¶1.) Acadia is a biopharmaceutical company that develops and commercializes medicines for central nervous disorders. (*Id.* at ¶2.) At issue is Acadia's drug, NUPLAZID (pimavanserin), which treats Parkinson's disease psychosis ("PDP"), a condition that leads to hallucinations and delusions in people with Parkinson's disease. (*Id.*) Those who take NUPLAZID are "typically geriatric patients advanced stage Parkinson's disease, as well as numerous medical conditions, who are frequently taking concomitant medications with risk for serious adverse events, including death." (*Id.* at ¶128.)

The clinical program for NUPLAZID consisted of four randomized, controlled trials for safety and efficacy, three of which failed to show a statistically significant improvement in psychosis symptoms. (Doc. No. 77 at ¶41.) The fourth and final trial, Phase III trial ("020"), was statistically positive. (*Id.*) Plaintiff notes that 11.6% of trial patients discontinued the trial, with twice the rate of discontinuation occurring in the drug group, mostly because of adverse events. (*Id.* at ¶42.)

In November 2013, Acadia published the results from the Phase III clinical trial in *The Lancet*. (Doc. No. 88-1 at 13.) The peer-reviewed article reported that "[t]hree deaths occurred (one in the placebo group from sudden cardiac death and two in the pimavanserin group from sepsis and septic shock); all were regarded as unrelated to study drug." (*Id.*)

Following the completion of the trial in August 2014, Acadia received a "Breakthrough Therapy Designation," which would speed up the drug's approval process because it targets an "unmet medical need." (Doc. No. 77 at ¶43.)

On September 1, 2015, Acadia submitted a new drug application ("NDA"). (*Id.* at ¶45.) On March 29, 2016, despite Dr. Andreason's (the primary reviewer) recommendation that the drug should not be approved "due to an unacceptably increased, drug related, safety

risk of mortality and serious morbidity," the Advisory Committee voted 12-2 in favor of approval primarily because of the drug's ability to treat an "unmet medical need" and the "lack of approved products to treat PDP." (*Id.* at ¶¶46, 48.)

On April 29, 2016, the U.S. Food and Drug Administration ("FDA") approved NUPLAZID, the only drug approved for the treatment of PDP. (*Id.* at ¶2.) That same day, Acadia issued a press release entitled "FDA Approves Acadia Pharmaceuticals' NUPLAZID (pimavanserin) – The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis." (*Id.* at ¶75.) The press release stated, in relevant part, that the Phase III Study was the largest research and development program in PDP research; that NUPLAZID significantly reduced the "frequency and severity of psychotic symptoms compared to placebo"; and that the "***benefit was achieved without impairing motor function*** . . . ***the most common adverse reactions*** . . . ***were peripheral edema*** . . . ***and confusional state***[.]" (*Id.*)[1]

A few days after FDA approval, on May 2, 2016, there was an analyst conference call to discuss the FDA's approval of NUPLAZID. (*Id.* at ¶77.) In the call, Defendant Davis stated that NUPLAZID has a "unique pharmacology" compared to other antipsychotics and with this "novel mechanism NUPLAZID significantly reduces the hallucinations and delusions in patients with PDP, and, importantly, does so without impairing motor function." (*Id.*) Later in the same call, Defendant Moore described Acadia's commercialization strategy as a "well designed plan." (*Id.* at ¶79.) The plan described included: "market education," "[i]ncreas[ing] awareness" among "the approximately 11,000 key physicians we have identified as PDP treating physicians," "onboard[ing] 132 new employees as neuroscience sales specialists," and "direct educational efforts with a variety of multi-channel education activities." (*Id.*) Lastly, during that call, Defendant Davis described the key components of Acadia's gross to net adjustments stating: "key components of what will be included in these adjustments . . . include fees paid to . . .

[1] Unless otherwise indicated, the emphasis comes from the SAC.

specialty pharmacies and distributors; rebates and charge backs associated with government programs including . . . share of the doughnut hole for Medicare Part D patients; patient assistance to eligible privately insured patients; and any product returns." (*Id.* at ¶81.)

The following day, on May 3, 2016, Acadia filed a Form 8-K with the SEC announcing that three members of Acadia's Board of Directors left—two opted to not run for re-election and one resigned. (*Id.* at ¶82.) A couple of days later, on May 5, 2016, Acadia hosted another analyst call to discuss the company's first quarter results from 2016. (*Id.* at ¶83.) Therein, Defendant Davis commented on the pricing of the drug noting that the drug "has a very overall favorable safety profile and tolerability profile . . . that was an important consideration." (*Id.*) Defendant Moore also noted that the drug has "advantages over existing therapies and there are good reasons for physicians to consider switching their patients." (*Id.* at ¶84.)

On May 31, 2016, Acadia commercially launched NUPLAZID. (*Id.* at ¶51.) Acadia's press release on that day reiterated similar comments made during the aforementioned calls about the drug's safety profile and the drug's unique pharmacology. (*Id.* at ¶85.)

About a month and a half later, on July 9, 2016, Acadia issued another press release entitled "Acadia Pharmaceuticals Reports Second Quarter 2016 Financial Results." (*Id.* at ¶87.) The press release focused on commercialization efforts and explained that Acadia is "expanding awareness of NUPLAZID among healthcare professionals through a number of initiatives including speaker programs, media and digital campaigns, and symposia at major medical meetings and . . . working with payors to make NUPLAZID available to eligible patients." (*Id.*) According to Plaintiff, Acadia "admitted in the press release that while it reported net product sales of $97,000 for the three months ended June 30, 2016, it had 'no similar net product sales . . . for the comparable period of 2015' prior to NUPLAZID's approval and commercialization." (*Id.* at ¶88.)

About one month later, on August 4, 2016, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended on June 30, 2016. (*Id.* at ¶89.) Plaintiff alleges that the black box warning did not state that "risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at a greater risk of death even if they did not suffer from dementia and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID." (*Id.*) That same day, in responding to an analyst question about the drug's efficacy or safety profile, Defendant Davis commented that "everything is supportive of the profile . . . that the drug demonstrated in clinical trials . . . which is not always the case[.]" (*Id.* at ¶91.)

On November 7, 2016, Acadia issued another press release entitled "Acadia Pharmaceuticals Reports Third Quarter 2016 Financial Results." (*Id.* at ¶93.) Therein, Defendant Davis touted a "solid month-over-month prescription growth." (*Id.*) During a conference call that same day, Defendant Davis stated that they are "seeing steady adoption by physicians with consistent additions of new [writers] each week[.]" (*Id.* at ¶96.)

On November 7, 2017, Defendant Young "***described Acadia's expenses***" without revealing the alleged improper payments to physicians to prescribe NUPLAZID. (*Id.* at ¶116.) Moreover, Defendant Davis stated, ***"On the commercial side, we are seeing important progress on multiple fronts . . . we continue to make strong progress on our promotional efforts for NUPLAZID with increased brand awareness."*** (*Id.*)

On February 27, 2018, Acadia announced fourth quarter 2017 NUPLAZID sales of $43.6 million, which was approximately $720,000 below consensus estimates. (*Id.* at ¶15.) On this news, Acadia's stock price fell $6.24 per share to close at $24.92 per share. (*Id.* at ¶16.) In a conference call that same day, Defendant Young "***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID." (*Id.* ¶119.) Defendant Davis then commented on NUPLAZID's "successful commercialization," attributing it to: "***growth in the number of physicians prescribing NUPLAZID, including at academic centers, and community practices and in long-term***

***facilities . . . including physician intent to prescribe more; and finally, we continue to enjoy very high levels of access***." (*Id.* at ¶119.)

On April 9, 2018, CNN reported that individuals with medical expertise were worried that the drug "had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess NUPLAZID's true risks." (*Id.* at ¶17.) On this news, Acadia's stock fell $5.03 per share to close at $16.50 per share. (*Id.* at ¶18.)

On April 10, 2018, Acadia issued a press release entitled "Acadia Statement Regarding the Efficacy and Safety of NUPLAZID." (*Id.* at ¶124.) Therein, Acadia emphasized the Company's focus on patient safety and that the continuous assessment of new data has revealed "no change in the benefit/risk profile described in the NUPLAZID Prescribing Information." (*Id.* at ¶125.) That same day, the FDA released a statement to the media. (*Id.* at ¶128.) The FDA stated that it "continues to monitor adverse events reported with NUPLAZID that are submitted to the FDA Adverse Event Reporting System (FAERS)" and "based on these data, the FDA has, at this time, not identified a specific safety issue that is not already adequately described in the product labeling." (*Id.*)

On April 25, 2018, CNN reported that the FDA was re-examining the safety of the NUPLAZID. (*Id.* at ¶19.) On this news, Acadia's stock fell $4.27 per share to close at $15.20 per share. (*Id.* at ¶20.)

On April 27, 2018, Acadia published a statement entitled "Acadia Pharmaceuticals Issues Statement Reaffirming Benefit/Risk Profile of NUPLAZID." (*Id.* at ¶128.) The statement emphasized patient safety and noted "as a manufacturer of a newly launched drug, we are routinely in contact with the FDA regarding requests for additional information on NUPLAZID, including post marketing safety surveillance information as part of the FDA's ongoing safety monitoring." (*Id.*) In reference to the increased reporting of adverse events, Individual Defendants stated that "[b]ecause Nuplazid is distributed through a specialty distribution channel, we have frequent (in most cases monthly) contact with patients and caregivers through our distribution partners . . . [t]his increased

interaction naturally results in dramatically higher adverse event collection and reporting[.]" (*Id.*)

On May 4, 2018, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports First Quarter 2018 Financial Results," which reported similar statements to previous reports. (*Id.* at ¶¶130, 131.) That same day, Acadia had another conference call wherein Plaintiff alleges Defendants Davis and Young "described Acadia's expenses without revealing the improper payments to physicians to prescribe NUPLAZID." (*Id.* at ¶132.)

Thereafter, on July 9, 2018, the Southern Investigative Reporting Foundation ("SIRF") published a report that stated, "something is horribly wrong with . . . NUPLAZID" and that "Acadia has accomplished its growth in ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentive prescription writing and downplaying mounting reports of patient deaths." (*Id.* at ¶21.) On this news, the stock price fell $1.21 per share to close at $16.63 per share. (*Id.* at ¶22.)

According to the SIRF report, in 2017, Acadia paid "more than $8.6 million to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each." (*Id.* at ¶69.) One doctor, Dr. Hermanowicz, had been "touting the efficacy of the drug" even before its approval; he received $10,421 from Acadia in 2016. (*Id.*) Plaintiff alleges that "many of the physicians who received Acadia's consulting fee payments in 2016 and 2017 are the same individuals who prescribed NUPLAZID with some frequency in 2016." (*Id.* at ¶72.) Acadia does not release NUPLAZID's prescription count, which means that Medicare Part D data is the "only way to observe prescriber behavior." (*Id.* at ¶135.) The SIRF report states that in 2016, "14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received 'consulting fees' in 2017 worth more than $1.21 million in total." (*Id.* at ¶¶72, 73.)

Confidential Witness 1 explained that physicians who participated in the company's speaker program received compensation and reimbursements per program and that such speaker engagements influenced the physicians' prescribing practices. (*Id.* at ¶74.)

On November 28, 2018, Acadia filed a prospectus supplement, which included a sentence revealing that, two months prior, Acadia received a civil investigative demand from the Department of Justice ("DOJ") (*Id.* at ¶¶23, 24.) The DOJ investigation remains ongoing. (*Id.* at ¶24.)

On March 27, 2019, the Institute for Safe Medication Practices ("ISMP") issued a report that called on the FDA to reevaluate the drug because of certain safety signals, including 43,781 reported patient deaths, or revise the black box warning. (*Id.*) Plaintiff alleges that as a result of Defendants' wrongful acts and omissions, Acadia's securities' market value decreased, causing significant losses and damages. (Doc. No 77 ¶25.)

**B. Procedural History**

Relevant here, on June 1, 2020, the Court granted in part and denied in part Defendants' motion to dismiss the consolidated amended class action complaint. (Doc. No. 65.) On June 29, 2020, Defendants filed a motion for reconsideration. (Doc. No. 66.) During a status hearing on July 9, 2020, the Court instructed Plaintiff to file a second amended complaint ("SAC") and denied as moot, and without prejudice, Defendants' motion for reconsideration. (Doc. No. 72.) The Court also instructed that after Plaintiff's filing of a SAC, Defendants are permitted to file another motion to dismiss wherein they may renew, as necessary, arguments raised in their motion for reconsideration. (*Id.*) Before the Court is Defendants' motion to dismiss Plaintiff's SAC. (Doc. No. 88.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6) Standard of Review

A Rule 12(b)(6) motion tests the legal sufficiency of the claims made in the complaint.[2] Accordingly, dismissal under Rule 12(b)(6) is proper where the complaint fails

[2] "Rule" refers to the Federal Rules of Civil Procedure.

to set forth a "cognizable legal theory," or where there is "an absence of sufficient facts alleged to support a cognizable legal theory." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001) (citing *Ballistreri v. Pacifica Police Dept.,* 901 F.2d 696, 899). Although a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under Rule 8(a)(2), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 544, 555 (2007) (internal quotations, brackets, and citations omitted). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all "allegations of material fact," and construe them "in the light most favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1996).

**B. <u>Heightened Pleading Standard</u>**

Pertinently, a complaint alleging fraud must comply with Rule 9(b). Under Rule 9(b), when the complaint includes allegations of fraud, a party must "state with particularity the circumstances constituting fraud or mistake," while "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "In other words, the complaint must set forth what is false or misleading about a statement, and why it is false." *Rubke v. Capitol Bancorp Ltd.,* 551 F.3d 1156, 1161 (9th Cir. 2009) (internal quotation marks omitted). Moreover, fraud claims made pursuant to the Securities Exchange Act must "plead with particularity both falsity and scienter." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 990 (9th Cir. 2009), as amended (Feb. 10, 2009).

Finally, claims brought under the Exchange Act are also subject to the requirements of the Private Securities Litigation Reform Act ("PSLRA") regarding scienter. The PSLRA "requires that a complaint alleging misleading statements or omissions 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed.'" *Reese v. BP*

*Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011) (quoting 15 U.S.C. § 78u-4(b)(1)). "Thus, the misrepresentation claims pled [under the Exchange Act] must satisfy the 'particularity' requirement of Rule 9(b) of the Federal Rules of Civil Procedure, the 'plausibility' requirement of *Iqbal*, and the scienter requirement of the PSLRA." *Id*. at 690-91.

## III. DISCUSSION[3]

Defendants again move to dismiss both of Plaintiff's causes of actions in the SAC. As for the section 10(b) cause of action, Defendants argue that Plaintiff fails to adequately plead a material misstatement or omission, fails to plead a "strong inference" of scienter, and fails to plead loss causation. As for the section 20(a) claim, Defendants argue that Plaintiff fails to satisfy the first prong of the control-person liability claim.

### A. Securities Fraud

Section 10(b) of the Exchange Act forbids: (1) the use or employment of any deceptive device, (2) in connection with the purchase or sale of any security, and (3) in contravention of Securities and Exchange Commission rules and regulations. 15 U.S.C. § 78j(b); *see Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Additionally, Rule 10b-5, promulgated by the SEC under Section 10(b), forbids the making of any "untrue statement of a material fact" or the omission of any material fact "necessary

[3] The pinpoint page citations refer to the ECF-generated page numbers that appear at the top of each filing. Of pertinence to the Court's later analysis are the following documents: The *Lancet* article, FDA's public statements regarding NUPLAZID, FDA Adverse Event Reporting System (FAERS), FAERS Public Dashboard, and various public statements made by Individual Defendants. Federal Rule of Evidence 201(b) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Additionally, the incorporation doctrine exists to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). Here, considering Plaintiff's claims depend on the aforementioned documents and the SAC refers to such documents, the Court deems it appropriate to incorporate their contents herein. Moreover, Defendants are not primarily offering the aforementioned documents for the truth of the underlying facts they contain, but rather, to support their contention that said information was public information. In any event, Plaintiff does not dispute that the information was public or that the information is accurate.

in order to make the statements made not misleading." 17 C.F.R § 240.10b-5; *see Dura,* 544 U.S. at 341. To succeed in a private civil action under Section 10(b) and Rule 10b-5, a plaintiff must establish "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura,* 544 U.S. at 341-42.

Here, Defendants challenge three of the elements necessary to prove a Section 10(b) and Rule 10(b)(5) claim: a (1) materially false statement or misleading statement; (2) scienter, and (3) loss causation.

1. <u>Material Misstatement or Omission</u>

To allege an actionable false or misleading statement, a plaintiff must show that Defendants made statements that were "misleading as to a material fact." *Basic Incorporated, et al. v. Levinson,* 485 U.S. 224, 238 (1988). A material statement is one where there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231-32. Moreover, according to the Ninth Circuit:

> [n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not. To be actionable under the securities laws, an omission must be misleading; in other words[,] it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.

*Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th. Cir. 2002). This is a demanding standard, requiring a plaintiff to allege with specificity "contemporaneous statements or conditions," *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir. 2001), that demonstrate both "how and why the statements were false" when made, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1071-72 (9th Cir. 2008).

Here, Plaintiff's basic argument is that Defendants failed to provide *more* information as to NUPLAZID's safety profile, *more* information as to adverse event tracking and reporting, and *more* information as to their commercialization strategy.

Specifically, Plaintiff argues that Defendants misled investors because they failed to disclose that the clinical trials resulted in some deaths, failed to disclose post-marketing events (about the FAERS data), and failed to disclose alleged kickbacks to physicians. Defendants argue that they (1) said nothing misleading about the clinical trial results, (2) the FAERS data was public, and that (3) the payments to physicians were lawful payments for lawful engagements, and, even if they were unlawful, Defendants did not have a duty to accuse themselves of wrongdoing. The Court will address each allegation separately.

*i. Disclosure of Clinical Trial Results*

The Court acknowledges that in its Order on the first motion to dismiss ("First Order"), the Court found that Plaintiff alleged sufficient facts to establish that failure to disclose the clinical trial results was misleading to investors. (Doc. No. 65 at 11.) Upon further reflection on the facts and supporting authority, however, the Court deems it appropriate to reconsider its earlier finding.

As to NUPLAZID's safety profile, the premise of Plaintiff's argument is that Defendants failed to disclose that patients treated with NUPLAZID during the Phase III trial died at twice the rate of patients treated with placebo, that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, and that patients with PDP were also at greater risk of death even if they did not suffer from dementia. (Doc. No. 77 at ¶¶76, 89.) Defendants point out that they (1) published the results from the 020 (Phase III) trial in the *Lancet* (a medical journal); (2) that the FDA publicly disclosed extensive briefing regarding the drug and the trials; and (3) that investment analysts also reported on the published results. (Doc. No. 88 at 13.) Defendants appear to assert a "truth-on-the-market" defense, arguing that the information Plaintiff seeks was publicly available.

A "truth-on-the-market" affirmative defense excuses a defendant's failure to disclose material information "where the information was made credibly available to the market by other sources." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991). To avoid liability under this theory, "any material information which insiders fail to disclose must be transmitted to the public with a degree of intensity and credibility

sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016) (quoting *In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1116 (9th Cir. 1989)).

In the First Order, the Court found that Plaintiff established a plausible misleading claim based on mortality rate because it would be inappropriate at this stage to dismiss based on the truth-on-the-market defense. (Doc. No. 65 at 10, 11.) While courts rarely dismiss on the basis of this defense, the judicially noticed facts in this case reveal that the information withheld had been transmitted to the public for a considerable period of time such that consideration of the truth-of the market defense is appropriate.

Moreover, *In re Iso Ray*, the case on which the Court previously relied, is distinguishable. There, the plaintiffs alleged that in a press release, the defendants, "completely mischaracterized" a medical journal study's, and plaintiffs only learned of the mischaracterization from an article. 189 F. Supp. 3d at 1064. Notably, the medical journal study was published on May 19, the press release was issued the next day on May 20, and the article revealing the defendants' mischaracterization was issued on May 21. *Id.* In declining to entertain a truth-of-the-market defense at the motion to dismiss stage, the district court noted that "the Press Release was issued on the heels of the issuance of the Study" and that it was debatable "whether between May 19 and 20, the [study or its abstract] could be deemed to have been transmitted to the investing public with the same degree of intensity and credibility as the Press Release." *Id.* at 1074.

The instant case is different. Here, Defendants disclosed the Phase III clinical trial results in a peer-reviewed study in the *Lancet* medical journal in November 2013—three years before the drug's FDA approval and Defendants' allegedly misleading press release. Unlike in *In Re Iso Ray*, where it was arguable whether the market had enough time to correct itself over the narrow period of time between the mischaracterization of the study and the actual study, Defendants' Phase III clinical trial results were published and were available on the market for three years prior to the drug's approval and the press release.

As such, the Court finds it implausible that reasonable analysts and investors who followed Acadia and NUPLAZID's anticipated approval, would have failed to read the study in the *Lancet*. By the time of the press release, the clinical trial results were "transmitted to the public with a degree of intensity and credibility to effectively counterbalance the misleading impressions created by insider one-sided representations." *In re Iso Ray*, 189 F. Supp. 3d at 1073.

Thus, based on the foregoing, an efficient market—which Plaintiff pleads existed here through repeated references to an "unusually heavy trading volume" and noting that "[a]t all relevant times, the market for Acadia's securities was an efficient market"—would have reflected all publicly available information about Acadia's clinical trial results. Accordingly, the Court finds that Defendants could not have misled investors by concealing facts it had already disclosed.

Plaintiff also argues that Defendants misled investors because they frequently "touted" the safety profile of the drug. Plaintiff points to statements about NUPLAZID's ability to decrease the "frequency and severity of psychotic symptoms compared to placebo," that NUPLAZID does not impair motor function, and that "***[t]he most common adverse reactions . . . were peripheral edema . . . and confusional state***" (Doc. No. 77 at ¶75.) Plaintiff argues the aforementioned statements, which were in some form repeated through other press releases or conference calls, were false and misleading because patients treated with the drug died at the twice the rate of those treated with placebo. (*Id.* at ¶¶27, 28.) The publicly available information, however, undermines Plaintiff's claims.

Again, after reviewing the NUPLAZID'S clinical trial results, the FDA Advisory Committee approved the drug with an overwhelming 12-2 majority vote—therefore undercutting Plaintiff's bald assertion against the drug's safety. (*Id.* at ¶48.) Moreover, in April 2018, the FDA reported in April 2018 that it has not identified a "specific safety issue" that was not "already adequately described" in NUPLAZID's labeling. (*Id.* at ¶128.) Lastly, the Court notes that physicians (who were not paid) still prescribed NUPLAZID, including Dr. Susan Baser, the leading prescriber of NUPLAZID, because it is the "only

drug addressing [Parkinson's Disease psychosis]" that has "positive effects . . . despite the noise about adverse events." (*Id.* at ¶134.) All in all, "as long as the omissions do not make the actual statements misleading, *a company is not required to disclose every safety-related result* . . . even if the company discloses some safety-related results and even if investors would consider the omitted information significant." *In re Rigel Pharm. Inc. Sec. Litig.,* 697 F.3d 869, 880 n.8 (9th Cir. 2012) (emphasis added). And here, to reiterate, the Company disclosed the clinical trial in its entirety, evidence that the medical and science community considered in approving NUPLAZID's safety and efficacy.

Therefore, the Court finds that Plaintiff has not pled sufficiently particular facts to show misleading statements or omissions based on publicly available clinical trials information and an overly broad statement about NUPLAZID's safety profile.

*ii. Post-Marketing Events*

Defendants next argue that the FAERS data cannot give rise to a claim for fraud by omission because the data was public record and investors were presumed to have access to it. *See Philico Invs. V. Martin,* No. C10-02785 CRB, 2011 WL 4595247, at *9 (N.D. Cal. Oct. 4, 2011) (investors "presumably" had access to FAERS data). In the First Order, the Court found that Plaintiff adequately pled that the failure to disclose FAERS data were false or misleading because (1) Defendants' assertion of the truth-on-the-market defense was inappropriate at this stage, and that (2) unlike the case in *Philico,* here, no facts exist whether Plaintiff was a sophisticated investor in the pharmaceutical industry. (Doc. No. 65 at 12.) Upon further reflection, the Court again deems it appropriate to reconsider its prior findings.

Regardless of Plaintiff's sophistication to navigate the FAERS data, the FAERS data is public information and an efficient market incorporates "all publicly available information." *Heliotrope Gen., Inc. v. Ford Motor Co.,* 189 F.3d 971, 975-76 (9th Cir. 1999). "The question remains whether a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal

quotation marks omitted) (citing *Basic*, 485 U.S. at 232). Instructive here, the Supreme Court in *Matrixx Initiatives, Inc.* noted that "the fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event . . . the mere existence of reports of adverse events—which says nothing in and of itself about whether the drug is causing the adverse events—will not satisfy this standard." *Id.* And while the *Matrixx* court ultimately held that the plaintiffs satisfied materiality because defendants possessed reliable information about an established causal link between their drug and the adverse event (anosmia), no such circumstances are present here. *Id.* at 46-47.

Assuming Plaintiff's allegations to be true, the SAC, reciting FDA reports, provided that the FDA has "not identified a specific safety issue that is not already adequately described in the product labeling." (Doc. No. 77 at ¶127.) Moreover, although the SAC cites that FAERS reported 43,781 deaths, this number pertains to all drugs listed in FAERS, and not for NUPLAZID alone.[4] Therefore, this allegation is misleading, irrelevant, and does not factually support a causal link between NUPLAZID and death.

Additionally, the fact that NUPLAZID consumers typically include geriatric patients with numerous medical conditions raises an "obvious alternative explanation," *Iqbal,* 556 U.S. at 682, that those taking NUPLAZID who died may have passed due to old age or underlying medical conditions unrelated to NUPLAZID. (*Id.* at ¶125.) Another "obvious alternative explanation" for the increased reporting of adverse events is that NUPLAZID is distributed through a "specialty distribution channel," which results in frequent contact with patients and caregivers that "naturally results in dramatically higher adverse event collection and reporting compared to products without such a distribution method." (*Id.* at ¶128.) As such, without sufficient factual enhancement concerning Plaintiff's claimed link between NUPLAZID and death, the Court declines to find that failure to disclose FAERS data amounts to a material omission. And in any event, the FAERS data is public information and an efficient market incorporates "all publicly available information."

---

[4] Plaintiff conceded that the FAERS data cited in the SAC are for all drugs listed in FAERS and not for NUPLAZID alone.

*Heliotrope Gen., Inc.,* 189 F.3d at 975-76. Accordingly, Defendants' nondisclosure of FAERS data was not misleading.

*iii. Alleged Kickbacks*

Lastly, Defendants argue that payments made to physicians were lawful, that the payments were accounted for "to the penny" in three places (a government database, in repeated marketing statements, and in their selling, general, and expenses reports), and that they do not have a duty to accuse themselves of wrongdoing. (Doc. No. 88-1 at 25, 26.) Plaintiff, on the other hand, provides detailed payments to physicians. Particularly startling is the SIRF report which states that in 2016, "14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received consulting fees in 2017 worth more than $1.21 million in total." (Doc. No. 77 at ¶¶72, 73.) Not only that but Plaintiff's Confidential Witness 1 explained that physicians who participated in the Company's speaker program received compensation and reimbursements per program and that such speaker engagements influenced the physicians' prescribing practices. (*Id.* at ¶74.)

In the First Order, the Court found that Plaintiff adequately pled Defendants' failure to disclose alleged unlawful payments to physicians is a material omission. (Doc. No. 65 at 12, 13.) The Court affirms its earlier finding concerning the alleged kickbacks and provides additional elaboration. The strongest fact evidencing kickbacks in this case is the DOJ investigation into the matter, which Defendants failed to notify Plaintiff of until two months after Defendants' receipt of a "civil investigative demand." (Doc. No. 77 at ¶23.) Moreover, the investigation remains ongoing. (*Id.*) The initiation of a DOJ investigation reveals that Acadia is, in fact, suspected of wrongful conduct, and the fact that the investigation remains ongoing reasonably implies that the nature and extent of the suspected activity have not warrant an early termination of the investigation.

Defendant cites to *Loos v. Immersion Corp.,* 762 F.3d 880, 883 (9th Cir. 2014), for the proposition that "[t]he announcement of an investigation does not 'reveal' fraudulent practices to the market. (Doc. No. 66 at 14.) Unlike in *Loos*, where the investigation was

an "internal investigation into the company's revenue accounting practices," here, the investigation is not internal—it was initiated by the DOJ. *Id.* at 882. The Court therefore finds that the investigation at issue here holds significant import and should have been disclosed to Plaintiff. As such, the Court finds *Loos* distinguishable. Moreover, as more thoroughly discussed below, the fact that three executives left merely four days after FDA approval, after having spent years developing the drug, supports the inference that kickbacks were indeed a part of Defendants' commercialization strategy—a strategy those three executives would not support or partake in.

Accordingly, viewing the factual allegations of the SAC as a whole, it alleges facts suggesting Defendants paid doctors to induce prescription writing of NUPLAZID, which constitutes a material fact that would have made it substantially likely that a reasonable investor would have viewed this information "as 'having significantly altered the "total mix" of information made available.'" *Basic,* 485 U.S. at 232. Accordingly, Plaintiff has adequately pled that statements concerning Defendants' commercialization strategy were false or misleading because they failed to disclose complete information concerning the payments to physicians.

2. Strong Inference of Scienter

"Scienter is [the] essential element of a Section 10(b) claim." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1032 (9th. Cir. 2002). The Supreme Court has explained that scienter for purposes of Section 10(b) and Rule 10b-5 is "the defendant's intention to deceive, manipulate or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 308 (2007). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C Section 78u-4(b)(2)). A "strong inference" is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324. When analyzing the sufficiency of a plaintiff's scienter pleadings, the Court must "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter." *N.M. State Inv. Council v. Ernst & Young LLP,* 641

F.3d 1089, 1095 (9th. Cir. 2011). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Here, the Court's First Order found that Plaintiff sufficiently alleged that scienter had been adequately pled because (1) Defendants tracked adverse events and had access to data showing that the Company paid doctors; (2) three ACADIA directors resigned four days after the FDA approved NUPLAZID; and (3) NUPLAZID is Acadia's only source of revenue. (Doc. No. 65 at 13, 14.) Upon review of the SAC, the Court again finds that Plaintiff has adequately pled scienter and expands on its earlier findings.

Specifically, the Court finds that the departure of three of the company's executives strongly supports scienter because the timing and circumstances of their departure is highly indicative that they knew about and wanted no part of the drug's commercialization strategy, which included the alleged kickbacks. Defendants argue that the executives' departures are not sufficient to support scienter because they could have left for "personal or benign" reasons. (Doc. No. 88-1 at 29-30.) While Defendants' alternative explanation may be possible, it is not clearly obvious. Rather, the Court finds that from Plaintiff's allegations, it is plausible and reasonable to infer that the executives' departures are attributed to questionable activity for which they did not want to be liable. The Court notes that not one, but three executives departed at the same time, and only four days after the drug's approval. (Doc. No. 77 at ¶82.) As such, because the executives chose to depart at a time when they would be otherwise reaping the benefits of their work on a specialized and one-of-a-kind drug, the Court finds it reasonable to infer that their departure was caused by concerns over Acadia's business practices.

Thus, engaging in a "comparative evaluation" and considering "not only inferences urged" by Plaintiff but also "competing inferences rationally drawn from the facts alleged," the Court rejects Defendants' contention that scienter is not alleged via contemporaneous executive departures right after NUPLAZID's FDA approval. *Tellabs,* 551 U.S. at 314, 323-24. Therefore, considering the allegations in their totality, the Court finds that at this

stage of pleading, Plaintiff's allegations support a strong inference of scienter that Defendant Davis, Moore, and Young acted with at least deliberate recklessness, and one that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Afterall, Defendants Davis, Moore, and Young were executives—who "by virtue of their receipt of information" and "their control over" operations made them "privy to confidential proprietary information concerning Acadia"—made statements about Acadia's commercialization strategy, which excluded references to direct payments to physicians. (Doc. Nos. 77 at ¶¶81, 150.) *See also Nursing Home Pension Fund, Loc. 144 v. Oracle Corp*., 380 F.3d 1226, 1234 (9th Cir. 2004) (finding that it is reasonable to infer that the executive' "detail-oriented management style led them to become aware of the allegedly improper revenue").

3. Loss Causation

Even when deceptive conduct is properly pled, a securities fraud complaint must also adequately plead "loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 807 (2011); *see Cement Corp.,* 507 F.2d 374 (2d Cir. 1974). Loss causation is shorthand for the requirement that "investors must demonstrate that the defendant's deceptive conduct caused their claimed economic loss." *Id*. Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentation, rather than some intervening event. *Dura,* 544 U.S. at 334-44. The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through "corrective disclosures" which "caused the company's stock price to drop and investors to lose money." *Halliburton,* 573 U.S. at 808.

Here, Plaintiff alleges that there were four stock drops, three preceded by a news article and one preceded by Acadia's press release. The first stock drop happened on February 28, 2018, the day after Acadia announced fourth quarter 2017 sales were approximately $720,000 below consensus estimates. (Doc. No. 77 at ¶¶15, 16.) The second stock drop happened sometime after the April 9, 2018 CNN report that experts are worried

that NUPLAZID had been "approved too quickly, based on too little evidence that it was safe or effective." (*Id.* at ¶¶17, 18.) The third stock drop happened after the April 25, 2018 news that the FDA was re-examining the safety of the NUPLAZID. (*Id.* at ¶¶19, 20.) The fourth stock drop occurred upon the July 9, 2018 SIRF report that Individual Defendants allegedly made unlawful payments to doctors to incentivize prescription writing. (*Id.* at ¶¶21, 22.) In the face of these allegations, Defendants' main argument against a finding of loss causation is that Plaintiff "never articulates what disclosures were "corrective," or why. (Doc. No. 88-1 at 32.)

The Court's First Order found that Plaintiff alleged loss causation because the revelation of Defendants' alleged misrepresentations regarding the drug's safety profile and kickbacks caused the stock price drops. (Doc. No. 65 at 16.) Upon further consideration, however, the Court agrees with Defendants that Plaintiff has failed to sufficiently allege any stock drop was preceded by a "corrective" disclosure because all the information, as detailed above, were public information.

As to the first stock drop, the Court does not find that Plaintiff alleged loss causation because it is expected and normal that upon a Company's announcement of disappointed earnings adversely affect the stock price. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("Loss causation requires more than an earnings miss.")

As to the second and third stock drops after the CNN reports, the Court does not find that the news were "corrective" because, as previously discussed, they did not reveal any prior untruth since the clinical trial results and FAERS data were publicly accessible information. While the Court initially stated that the FDA's approval of NUPLAZID did not *ipso facto* immunize Defendants from liability and this is not a trial about the drug's safety, what is important is that the FDA itself reported that it did not identify any safety issue that was not already adequately described in the product labeling—thereby confirming information that the market and investors, already knew.

As for the fourth stock drop after the SIRF report, the report details suspected unlawful behavior and such revelation could very well have been the only reason why the

stock price dropped thereafter. However, as Defendants accurately noted, the SIRF article merely reiterated public information. The SIRF report itself, as quoted in Plaintiff's SAC, drew its facts from public information because "Medicare Part D data is the only way to observe prescriber behavior" and compared that data to the "Centers for Medicare and Medicaid Services Open Payments data[.]" (Doc. No. 77 at ¶135.) Because a corrective disclosure "obviously must disclose *new* information," the fact that the sources used in the SIRF report were already public is fatal to Plaintiff's claim of loss causation. *See FindWhat Inv. Grp. V. FindWhat.com,* 658 F.3d 1282, 1311 n. 28 (emphasis added). And the "mere repackaging of already-public information is simply insufficient to constitute a corrective disclosure." *Meyer*, 710 F.3d at 119.

Thus, based on the foregoing, the Court finds that Plaintiff has failed to plead sufficient facts for loss causation because all information was public information, and no subsequent corrective disclosures were made.[5] Accordingly, the Court will grant Defendant's motion to dismiss the section 10(b) cause of action on this basis.

**B. Control-Person Liability Section 20(a) Claim**

Turning to Plaintiff's control-person liability claim against all Individual Defendants, "under Section 20(a), plaintiff must prove: (1) a primary violation of federal securities laws[]; and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). "Plaintiff need not show that the defendant was a culpable participant in the violation, but defendant may assert a 'good faith' defense." *Everex Systems,* 228 F.3d at 1065. Thus, "[t]o establish the liability of a controlling person, the plaintiff does not have

[5] The Court notes that Plaintiff did not provide allegations of any stock drop after Defendants announced the DOJ investigation.

the burden of establishing that person's scienter distinct from the controlled corporation's scienter." *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993).

Considering the Court's above finding that Plaintiff has failed to adequately state a claim for a violation of Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiff has not satisfied the first prong of the Section 20(a) requirements. Accordingly, the Court will grant Defendants' motion to dismiss the Section 20(a) claim.

## IV. CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendants' motion to dismiss. While the Court is mindful of the importance of private securities fraud actions to deter fraudulent activity, here, Plaintiff fails to meet the heightened pleading standards to show that misrepresentations caused his economic loss. Because additional factual allegations may allow Plaintiff to state viable claims, however, the Court grants Plaintiff **LEAVE TO AMEND** the SAC. Accordingly, Plaintiff must file a third amended complaint, with a redline version attached, no later than Friday, April 16, 2021. Failure to do so may result in dismissal of the case with prejudice.

**IT IS SO ORDERED.**

Dated: March 29, 2021

Hon. Anthony J. Battaglia
United States District Judge