**POMERANTZ LLP**
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th floor
New York, New York 10016
E-mail: jalieberman@pomlaw.com
E-mail: taweinrib@pomlaw.com
- *additional counsel on signature page* -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE ACADIA PHARMACEUTICALS INC. SECURITIES LITIGATION** | Case No.: 3:18-cv-01647-AJB-BGS<br><br>THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Thomas Wood ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Acadia Pharmaceuticals Inc. ("Acadia" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that acquired Acadia securities between April 29, 2016 and July 9, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Acadia is a biopharmaceutical company that purports to focus on the development and commercialization of medicines to address central nervous system disorders. The Company's ***first drug*** is NUPLAZID (pimavanserin), which

received approval by the U.S. Food and Drug Administration ("FDA") on April 29, 2016 for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis (or "PD Psychosis"). Though NUPLAZID is the only drug approved specifically for the purpose of treating PD Psychosis, there are off-label alternatives available such as Seroquel (quetiapine) and Clorazil (clozapine).

3. The Company launched NUPLAZID in the United States in May 2016. Prior to its commercialization of NUPLAZID, the Company did not earn any revenue from product sales.

4. Touting the results from its Phase III clinical trial of NUPLAZID, Acadia has always marketed NUPLAZID as superior to alternatives prescribed off-label with claims that because "NUPLAZID is a selective serotonin inverse agonist, or SSIA, preferentially targeting 5-$HT_{2A}$ receptors," it is not only efficacious at reducing hallucinations and delusions associated with PD Psychosis but also "has the potential to avoid many of the debilitating side effects of existing antipsychotics." Defendants have consistently and emphatically represented that the drug is safe.

5. In reality, the clinical trial results demonstrated that patients treated with NUPLAZID as opposed to placebo suffered severe adverse events ("SAEs"), ***<u>including death</u>*****, at** ***double the rate***. Notably, both the drug group and placebo group had the same patient population – there were no meaningful distinctions

between the two groups based on age, gender, severity of illness or other factors that would account for the higher death rate in patients treated with NUPLAZID.

6. The incidence of death in those treated with NUPLAZID was so high that Dr. Paul Andreason, a board-certified psychiatrist with more than 25 years of experience, and the primary reviewer for the FDA of Acadia's new drug application ("NDA") for NUPLAZID, issued a clinical review in September 2015 with a recommendation of "do not approve." Mr. Andreason made clear in his review that his recommendation not to approve was "due to an unacceptably increased, drug related, safety risk of mortality and serious morbidity."

7. Thereafter, an Advisory Committee convened on March 29, 2016 to evaluate NUPLAZID and make a recommendation to the FDA regarding approval. Despite Mr. Andreason's scathing review of the drug, and despite stated concerns from multiple members of the Committee regarding the drug's safety profile, the Advisory Committee voted 12-2 in favor of approval swayed substantially by the "unmet medical need" and lack of *approved* products to treat PD Psychosis. ***However, even those who voted in favor did so with stated reservations***.

8. Post-commercialization- the Company received mounting numbers of adverse event reports confirming Mr. Andreason and the Advisory Committee members' worst fears – the astronomical death and adverse event rates suffered by patients treated with NUPLAZID during clinical testing manifested in real world

usage as well. ***At no point during the Class Period did Acadia issue a press release revealing the surging number of adverse event reports nor did it reference the adverse event reports in any of its quarterly or annual filings with the SEC.***

9. As Acadia well knew, and conceded in its Class Period SEC filings, this increased risk of death in patients taking NUPLAZID could cause physicians to refrain from prescribing the drug. Indeed, as Mr. Andreason confirmed in his medical review, while NUPLAZID would be the first *FDA approved* drug to treat PD Psychosis, it "*will not be the only or possibly the best or relatively safest drug to prescribe for the treatment of PDP*." With no other products for sale, and no other drugs in the pipeline up for imminent FDA approval, Acadia desperately needed physicians to prescribe NUPLAZID to their patients suffering with PD Psychosis rather than opt for potentially safer off-label alternatives.

10. To that end, and unbeknownst to investors, Acadia began dispensing massive sums of money to doctors, couched as consulting or speaking fees, to incentivize prescription writing – a practice strictly prohibited by the False Claims Act and Anti-Kickback Statute. Defendants acknowledged their familiarity with the dictates of these regulations in SEC filings throughout the Class Period.

11. These improper payments triggered a serious risk that the Company would face regulatory scrutiny for its questionable practices. Specifically, for the

six months of 2016 following NUPLAZID's launch, Acadia spent $609,556 on consulting, speaking and travel and lodging payments with payments to individual doctors as large as $25,690 and $19,145. In 2017, the overall payouts skyrocketed. In 2017, Acadia paid more than $***8.6 million***, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each. For example, Acadia paid $180,123 to Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist. Acadia also paid $166,259 to Dr. Jason Kellogg, a psychiatrist from Santa Ana, California. In addition to prescribing the drug, both Hermanowicz and Kellogg have spoken and written extensively promoting NUPLAZID.

12. Many of the physicians who received Acadia "consulting fee" payments in 2016 and 2017 are the same individuals who frequently prescribed NUPLAZID in 2016. Notably, in ***2016***, 14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received "consulting fees" in ***2017*** worth more than $1.21 million in total.

13. For example, Dr. Hermanowicz ranked #8 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. David Keitzman, a neurologist from Commack, NY, received $14,203.38 from Acadia in 2016 and $154,988.18 in 2017. For 2016, Keitzman ranked #2 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. Stuart Isaacson, a neurologist from Boca Raton,

Florida, received payments of $3,250 from Acadia in 2016 and $154,560.04 in 2017. For 2016, Dr. Isaacson ranked #11 for prescriptions of NUPLAZID covered under Medicare Part D.

14. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, including that: (i) mounting reports of adverse events, serious adverse events, and deaths in patients using NUPLAZID post-commercialization, raised the risk that the FDA would reevaluate the drug's safety or, at minimum, that industry watchdogs would warn against prescribing the drug; (ii) as a result of NUPLAZID's deleterious safety profile, marginal efficacy, and the availability of off-label alternatives, Acadia's marketing strategy included massive payments to physicians for the purpose of inducing them to prescribe NUPLAZID; and (iii) these improper business practices, in contravention of federal regulations, raised a risk that Acadia would face regulatory scrutiny.

15. On April 9, 2018, CNN reported that "[p]hysicians, medical researchers and other experts told CNN that they worried that [NUPLAZID] had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks." Given that, at the time, the public could not easily access and decipher raw FDA Adverse Event Reporting System ("FAERS") data –

as the FDA itself has stated – the CNN article presented the first public hint to the market of the troubling and snow-balling post-commercialization safety signals.

16. On this news, Acadia's stock price fell $5.03 per share, or 23.4%, to close at $16.50 per share on April 9, 2018, on unusually heavy trading volume.

17. The next day, Defendants issued a press release designed to underplay the damning revelations in the CNN article, and touted NUPLAZID's benefit/risk profile and the Company's commitment to safety.

18. On April 25, 2018, CNN reported that the FDA was re-examining the safety of NUPLAZID.

19. On this news, Acadia's stock price fell $4.27 per share, or 21.9%, to close at $15.20 per share on April 25, 2018, on unusually heavy trading volume.

20. On July 9, 2018, the Southern Investigative Reporting Foundation ("SIRF")[1] published a report entitled "Acadia Pharmaceuticals: This Is Not a Pharmaceuticals Company." In its report, the SIRF stated that "evidence is mounting that something is horribly wrong with Acadia's sole drug, Nuplazid, an antipsychotic for Parkinson's disease patients who experience episodic hallucinations and delusions" and that "Acadia has accomplished its growth in

---

[1] SIRF changed its name to The Foundation for Financial Journalism in early 2020 but for efficiency will still be referenced as SIRF herein. The SIRF does not simply report on already public information but rather conducts investigations, or "***sleuthing***," to piece together the truth based on information that is "skillfully buried," "overlooked" or "forgotten." Its self-described purpose is to "bring to life important stories that illuminate the many ways investors, consumers and other stakeholders are regularly ***misled***." (Emphasis added).

ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths."

21. On this news, Acadia's stock price fell $1.21 per share, or 6.8%, to close at $16.63 per share on July 9, 2018, on unusually heavy trading volume.

22. Post- Class Period, on November 28, 2018, the Company filed a prospectus supplement on Form 424B5. Buried within that filing, the Company included a single sentence revealing that ***two months prior***, in September 2018, Acadia "received a civil investigative demand, or CID, from the DOJ pursuant to the Federal False Claims Act requesting certain documents and information related to our sales and marketing of NUPLAZID."

23. Then, on March 27, 2019, the Institute for Safe Medication Practices ("ISMP") issued a report which called upon the FDA to reevaluate the drug, or at minimum, revise NUPLAZID's confusing black box warning. While the FDA indicated in September 2018 that it found "no new or unexpected safety risks associated with NUPLAID (pimavanserin)," the ISMP analyzed the data and concluded that "FDA Reassurance of Pimavanserin Not Warranted." The ISMP explained that the Company had provided the FDA with the data it used for its reexamination and that 39% of the death reports the FDA reviewed contained insufficient information to make an adequate assessment. Highlighting frightening

safety signals, the ISMP noted that since the commercialization of the drug until September 2018 there had been 1,339 reported patient deaths.

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this Judicial District.

28. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of

interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

29. Plaintiff, as set forth in his previously filed certification, acquired Acadia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

30. Defendant Acadia Pharmaceuticals Inc. is incorporated in Delaware and its principal executive offices are in San Diego, California. Acadia's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the symbol "ACAD."

31. Defendant Stephen R. Davis ("Davis") was the President and Chief Executive Officer ("CEO") of Acadia at all relevant times.

32. Defendant Todd S. Young ("Young") was the Chief Financial Officer ("CFO") of Acadia from August 22, 2016, through the end of the Class Period.

33. Defendant Srdjan (Serge) Stankovic ("Stankovic") was the Executive Vice President ("VP") and Head-Research & Development of Acadia at all relevant times.

34. Defendant Terrance Moore ("Moore") was the Chief Commercial Officer & Executive VP of Acadia until March 2017.

35. Defendant Michael Yang ("Yang") was the Executive Vice President and Chief Commercial Officer of Acadia from March 2017 through the end of the

Class Period.

36. The Defendants described in ¶¶ 31-35 are sometimes collectively referred to herein as the "Individual Defendants."

37. Because of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of Acadia's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

38. Acadia is a biopharmaceutical company that purports to focus on the development and commercialization of medicines to address central nervous system disorders. The Company's *only* drug is NUPLAZID (pimavanserin),

approved by the FDA on April 29, 2016 for the treatment of hallucinations and delusions associated with PD Psychosis. The Company launched NUPLAZID in the United States in May 2016. As Acadia's SEC filings make clear, "Net product sales consist of sales of NUPLAZID, our first and only commercial product to date."

**The FDA Approval Process for NUPLAZID**

39. Any new drug must be put through a series of clinical trials to prove its safety and efficacy before it can be marketed and sold in the U.S. This includes human clinical trials that proceed in three phases. Phase 3 studies, the final phase, "are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." See 21 C.F.R. § 312.21(c). Such studies are considerably more extensive than the preceding phases. Phase 3 studies are large-scale trials, usually involving several hundred to several thousand subjects and are intended to gather the information necessary to provide an adequate basis for labeling the drug. See 21 C.F.R. § 312.21(c). The FDA considers all the clinical trials results and nonclinical studies in determining whether to approve a drug for market. See 21 C.F.R. §§ 314.125(b), 314.126(a).

40. NUPLAZID (aka Pimavanserin) was developed under IND 68,384 for the treatment of PD Psychosis. The clinical program consisted of four randomized, controlled trials for safety and efficacy, which utilized the Scale for the

Assessment of Positive Symptoms (SAPS) as the primary efficacy variable. ***This scale failed to show a statistically significant improvement in psychosis symptoms in <u>three</u> of the trials***. Following its first three failures, Acadia met with the FDA in April 2010 to discuss their clinical program and modifications of the design for a subsequent fourth pivotal trial. The resulting Phase III trial (ACP-103-020) was statistically positive.

41. The trial was randomized, which means that after enrolling patients – ***all of whom had to satisfy the same inclusion criteria to participate in the trial*** – the patients were randomly allocated to either the drug group or the placebo group. The point of this is to ensure that differences in safety and efficacy results between the two groups can be attributed to the drug rather than to some distinction between the two groups based on age, gender, severity of illness, or other non-drug related factor. Notably 11.6% of trial patients discontinued the trial, *with twice the rate of discontinuation occurring in the drug group, mostly because of adverse events*.

42. Following the completion of this trial, Acadia again met with the FDA in 2013 to gain agreement that an NDA would be accepted for filing based on data from a single, strongly positive trial with supportive safety and efficacy data from their earlier trials. ***The FDA usually requires evidence of more than one positive, adequate, and well-controlled trial for drug approval***. Then, Acadia received a

"Breakthrough Therapy Designation" for NUPLAZID in August 2014, a designation created by Congress in 2012 to speed up the FDA's approval process for treatments targeting an "unmet medical need."

43. NUPLAZID, therefore, did not need to meet the same rigorous requirements as other drugs seeking approval and skated through the FDA approval process with greater ease despite its deleterious risk profile.

44. Acadia submitted a new drug application ("NDA") to the FDA on September 1, 2015.

45. The incidence of death in those treated with NUPLAZID was so high that Dr. Paul Andreason, a board-certified psychiatrist with more than 25 years of experience, and the primary reviewer for the FDA of Acadia's new drug application ("NDA") for NUPLAZID, issued a clinical review in September 2015 with a recommendation of "do not approve." Mr. Andreason made clear in his review that his recommendation not to approve was "due to an unacceptably increased, drug related, safety risk of mortality and serious morbidity."

46. Indeed, emphasizing the availability of potentially safer alternatives, Mr. Andreason made clear in his review that:

> If pimavanserin is approved based only on the data in this NDA, then it will be the only drug approved for this use; however, ***pimavanserin will not be the only or possibly the best or relatively safest drug to prescribe for the treatment of PDP.*** If pimavanserin is approved based only on this data, then the market will reasonably assume that

pimavanserin is at least safer than clozapine. This conclusion would be misleading…

47. An Advisory Committee convened on March 29, 2016 to evaluate NUPLAZID and make a recommendation to the FDA regarding approval. Fifteen members of the public testified at the Advisory Committee hearing. Three were physicians and paid consultants for Acadia. Four worked with Parkinson's advocacy organizations funded by Acadia. The Company paid for the travel of three other witnesses. Another became a paid "brand ambassador" for NUPLAZID.

48. Despite Mr. Andreason's scathing review of the drug, and despite stated concerns from multiple members of the Committee regarding the drug's safety profile, the Advisory Committee voted 12-2 in favor of approval swayed substantially by the "unmet medical need" and lack of *approved* products to treat PD Psychosis.

49. Even those Committee members that voted "yes" did so with stated reservations, including that the side effects are "concerning," and "the benefit is not as great as I would have liked," "I think the concern about safety is real," "I voted yes with some reservations," "If there were a safe and effective alternative on the market, I would not have voted yes," "definitely have some concerns about the safety," "I voted yes with the plea to the FDA to please consider a large observational study so we can ensure that once it goes into real-world use, that the

benefits will outweigh the risks," and "So I will summarize now. I would say that even the people that voted yes did so with qualifications. There's concerns about the safety…"

50. The FDA accepted the Committee's recommendation and approved NUPLAZID the following month. While NUPLAZID contains a black box warning indicating that there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs, the warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs and that patients with PD Psychosis were also at greater risk of death even if they did not suffer from dementia.

51. Acadia commercially launched NUPLAZID on May 31, 2016.

**The FDA Adverse Event Reporting System ("FAERS")**

52. FAERS is a database designed to support the FDA's post-marketing safety surveillance program for all approved drug and therapeutic biologic products. Per the FDA, the FAERS data files contain only raw data and "[a] simple search of FAERS data ***cannot be performed*** with these files by persons who are not familiar with creation of relational databases." https://www.fda.gov/drugs/surveillance/fda-adverse-event-reporting-system-faers.

**Federal Regulations and Acadia's Improper Payments to Physicians**

**The Anti-Kickback Statute and the False Claims Act**

53. While Acadia may have been highly motivated to do everything

necessary to increase sales and revenues, numerous federal and state laws and regulations, as well as industry ethical guidelines, restrict the Company's ability to adopt certain practices in the sales and marketing of and billing for its products and services. While some of these sales and marketing practices may be commonly accepted and legal in many types of businesses, pharmaceuticals are unique because certain government programs, such as Medicare and Medicaid, depend on physicians and healthcare professionals to exercise independent judgment in the best interests of the patient. Thus, as explained by the Office of the Inspector General ("OIG"), the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."

54. Specifically, in 1972, Congress enacted the Federal Anti-Kickback Statute to address concerns regarding conflicts of interest and unfair competition, which lead to abuses of federal health care programs. The Anti-Kickback Statute provides, in pertinent part:

> "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall

> be fined not more than $25,000 or imprisoned for not more than five years, or both."

42 U.S.C. § 1320a-7b(b).

55. In addition to criminal and civil fines and penalties, including up to five years in prison, violation of the Anti-Kickback Statute can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs.

56. This is particularly relevant to Acadia given that throughout the Class Period, Acadia represented that for prescriptions of NUPLAZID, two-thirds are under Medicare Part D plans, almost a third commercial and the remainder covered under Medicaid.

57. Speaking about the Anti-Kickback Statute, the OIG warned that:

> ***"Also of concern are compensation relationships with physicians for services connected directly or indirectly to a manufacturer's marketing and sales activities, such as speaking, certain research, or preceptor or 'shadowing' services . . . In particular, the use of health care professionals for marketing purposes—including, for example, ghost-written papers or speeches—implicate the anti-kickback statute."***

58. With respect to "business courtesies and other gratuities," the OIG warned that entertainment, recreation, travel, meals, gifts, gratuities, and other business courtesies implicate the Anti-Kickback Statute ***if given to physicians in a position to make or influence referrals or if any one purpose is to generate business for the company***.

59. Similarly, consulting arrangements also may implicate the Anti-Kickback Statute. Although the Anti-Kickback Statute contains certain "safe harbors" for certain business arrangements, strict adherence with all applicable conditions set out in the relevant safe harbor is required in order to ensure compliance with the law. Among other things, compensation paid to consultants must be reasonable and must not be tied to the volume of business generated or the value of referrals.

60. Furthermore, under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266. The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. See 31 U.S.C. § 3729. With respect to Medicare and Medicaid, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. Medicare and Medicaid coverage is also limited to medical goods and services that are "reasonable and necessary" for the diagnosis and treatment of a patient. *See* 42 U.S.C. § 1395y(a)(1)(A).

61. Regulatory scrutiny of the medical industry also increased with the enactment of the Physician Payments Sunshine Act of 2009 and the Patient

Protection and Affordable Care Act in 2010 ("PPACA"). These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013.

62. With the enactment of the PPACA in 2010, ***violations of the Anti-Kickback Statute are per se violations of the False Claims Act***. Specifically, the PPACA changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act.

63. Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. See 42 U.S.C. §1320a-7b(h). Under the PPACA, even an unwitting and non-benefitting party within the stream of a reimbursement claim to Medicare or Medicare is liable for fraud if unlawful kickbacks taint any part of the claim.

64. As stated in Acadia's Class Period SEC filings, Defendants understood that they were, "subject to state and federal laws, including, among others, anti-kickback laws, false claims laws, data privacy and security laws, and transparency laws that restrict certain business practices in the pharmaceutical industry." Defendants demonstrated their awareness and understanding of

applicable regulations by explaining:

> The Anti-Kickback Statute "makes it illegal for any person or entity to knowingly and willfully, directly or indirectly, solicit, receive, offer, or pay any remuneration that is in exchange for or to induce the referral of business, including the purchase, order, lease of any good, facility, item or service for which payment may be made under a federal healthcare program, such as Medicare or Medicaid. The term "remuneration" has been broadly interpreted to include anything of value."
>
> ***
>
> "federal false claims and false statement laws, including the federal civil False Claims Act, prohibits, among other things, any person or entity from knowingly presenting, or causing to be presented, for payment to, or approval by, federal programs, including Medicare and Medicaid, claims for items or services, including drugs, that are false or fraudulent…"

65. Acadia further acknowledged its understanding throughout the Class Period that "a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act."

**<u>Acadia Dispenses Sizable Payouts to Physicians Prescribing NUPLAZID</u>**

66. Despite the potentially serious repercussions, and their acknowledged understanding of applicable regulations. Defendants employed practices that exposed the Company to liability and enforcement under healthcare fraud and abuse laws, including, *inter alia*, the Anti-Kickback Statute and the False Claims Act

67. As Acadia conceded in its Class Period SEC filings, the increased risk of death and adverse events in patients taking NUPLAZID could cause physicians

to refrain from prescribing the drug. Given that Acadia had no other approved products on the market providing revenue, Defendants desperately needed physicians to prescribe NUPLAZID. Defendants therefore began dispensing massive sums of money to doctors to incentivize prescription writing while downplaying mounting reports of patient deaths.

68. For example, for the six months of 2016 that followed NUPLAZID's launch, Acadia spent $609,556 on consulting, speaking and travel and lodging payments to 1,578 doctors: The largest payouts went to Dr. Leslie Citrome, a New York based psychiatrist, in the amount of $25,690 and Dr. Khashayar Dashtipour, a California based neurologist, for $19,145.

69. In 2017, the overall payouts grew substantially. In 2017, Acadia paid more than $***8.6 million*** to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each. For example, Acadia paid $180,123 to Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist. In 2016, Dr. Hermanowicz received $10,421 from Acadia. Hermanowicz has spoken and written extensively regarding the advantages of NUPLAZID. Indeed, even before NUPLAZID received its approval, Dr. Hermanowicz authored a journal article in the *Expert Review of Neurotherapeutics* hyping the drug and was quoted in a *MedPage Today* article in June 2015 touting the efficacy of the drug and characterizing its off-label competitors as coming

"with a lot of baggage in the form of side effects." Dr. Hermanowicz also authored an article published in *Neurology Times* regarding NUPLAZID on May 29, 2018.

70. Acadia also paid $166,259 to Dr. Jason Kellogg, a psychiatrist from Santa Ana, California. Kellogg has also spoken and written extensively about NUPLAZID, including in an article in "Today's Geriatric Medicine," entitled *New Drug Shows Promise in Treating Parkinson's Disease Psychosis*, where Kellogg is quoted as saying:

> Nuplazid treats psychosis-related symptoms in PD without producing any type of dopamine blockade. Because this medication has zero dopamine affinity, it's ideal for PD patients because they already have low levels of dopamine, he says.
>
> In the clinical trial, the medication was effective at reducing delusions and hallucinations, and an open-label extension of the trial was also conducted, Kellogg says. "What we learned is that there was durability of effect, and it was appearing that over time the delusions were coming down, albeit at a slower rate, but they were still coming down. So we won't need a lot of add-on therapy with this particular medication."

71. In an article published in the San Diego Business Journal on May 5, 2016, Kellogg lauds NUPLAZID and states, "“Patients have been waiting forever for a treatment like this to surface," said Dr. Jason Kellogg, a physician and psychiatrist who has been treating mental illness for over a decade." Kellogg is also quoted in an article entitled, "New Drug Offers Hope For Patients Suffering From Parkinson's Psychosis," published on May 12, 2016 in *Provider* magazine:

> "Using existing therapies to manage PDP is like trying to go north and south at the same time," says Jason Kellogg, MD, chief of staff at Newport Bay Hospital, Newport Beach, Calif., and a specialist in treating individuals with PDP in long term care settings. "Current antipsychotics will make the physical symptoms worse. It's a real innovation to finally have a medication that will improve the delusions and not worsen the motor function of Parkinson's patients."

72. Many of the physicians who received Acadia "consulting fee" payments in 2016 and 2017 are the same individuals who prescribed NUPLAZID with some frequency in 2016. Notably, in ***2016***, 14 of the 25 doctors that most frequently prescribed NUPLAZID to patients covered by Medicaid Part D received "consulting fees" in ***2017*** worth more than $1.21 million in total.

73. For example, Dr. Hermanowicz ranked #8 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. David Keitzman, a neurologist from Commack, NY, received $14,203.38 from Acadia in 2016 and $154,988.18 in 2017. For 2016, Keitzman ranked #2 for prescriptions of NUPLAZID covered under Medicare Part D. Dr. Stuart Isaacson, a neurologist from Boca Raton, Florida, received payments of $3,250 from Acadia in 2016 and $154;560.04 in 2017. For 2016, Dr. Isaacson ranked #11 for prescriptions of NUPLAZID covered under Medicare Part D.

74. Confidential Witness ("CW") 1, an executive neuroscience sales specialist for Acadia from April 2016 to April 2020[2], worked as a field sales rep

[2] CW1 was based in the Las Vegas, NV territory and reported to Regional Business Director Jack Ratelle, who reported to Senior Vice President Sales and

directly with physicians – pecifically neurosurgeons – to discuss NUPLAZID's advantages and "sign up" these physicians to participate in a speaker program to promote NUPLAZID. CW1 stated that management made it clear when NUPLAZID launched that the speaker program would play an important role in Acadia's commercialization efforts. CW1 explained that the physicians who participated in the speaker program received compensation per program plus an honorarium and travel reimbursement, with the average speaking engagement payment over $3,000. Among the physicians CW1 engaged was Dr. Dashtipour, referenced herein in ¶¶ 68, 134, beginning in 2016. Since that time, Acadia paid Dr. Dashtipour various fees, including *inter alia*, speaking fees, totaling approximately $262,000. According to CW1, as a result of the DOJ investigation (announced after the Class Period), Defendants changed their attitude regarding the speaker program and, on advice of counsel, terminated those employees that had been involved in enrolling physicians in the speaker program, including CW1 in March 2020. CW1 stated that once Acadia stopped paying Dr. Dashtipotour to speak, Dr. Dashtipour stopped prescribing NUPLAZID. CW1 confirmed that the speaker engagements influenced the physicians' prescribing practices.

---

Market Access Amanda Morgan and EVP, Chief Commerical Officer Michale Yang.

## Materially False and Misleading Statements Issued During the Class Period[3]

75. The Class Period begins on April 29, 2016 when Acadia issued a press release touting the FDA's approval of NUPLAZID, entitled "FDA Approves Acadia Pharmaceuticals' NUPLAZID™ (pimavanserin) - The First Drug Approved for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis." Therein, the Company emphasized that the FDA based its approval on Phase III Study data supporting both efficacy and safety. Specifically, the press release stated in relevant part:

> The FDA approval of NUPLAZID was based on data from the pivotal Phase III Study -020 and other supportive studies, representing the largest research and development program in Parkinson's disease psychosis to date. In Study -020, NUPLAZID significantly reduced the frequency and severity of psychotic symptoms compared to placebo on the Scale for Assessment of Positive Symptoms – Parkinson's Disease (SAPS-PD). ***This benefit was achieved without impairing motor function. The most common adverse reactions (≥5% and twice the rate of placebo) in this study were peripheral edema (7% NUPLAZID vs 3% placebo) and confusional state (6% NUPLAZID vs 3% placebo).***
>
> ***
>
> ***Acadia plans to make NUPLAZID commercially available to patients suffering from hallucinations and delusions associated with Parkinson's disease psychosis in the United States in June 2016...***

---

[3] In accordance with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4, this section identifies the alleged misleading statements, the speaker of those statements, and the reasons why those statements are misleading. The statements in this section set forth in ***bold and italics*** are materially false and misleading for the reasons set forth herein. Certain of these statements are alleged to have been false and misleading by omission. Additional text, which does not appear in ***bold and italics***, is thus provided for context to illustrate how the omissions rendered such statements false and misleading.

> ***Acadia will be introducing NUPLAZIDconnect, a comprehensive program that provides financial assistance and/or access assistance to patients, their caregivers, and physicians.***

76. The foregoing statements were false and misleading because, while hyping that NUPLAZID did not impair motor function, and describing "the most common adverse reactions," the Company did not explain that: (i) as a result of NUPLAZID's deleterious safety profile, marginal efficacy, and the availability of safer off-label alternatives (as Mr. Andreason made clear), Acadia's current commercialization "plans" did not only include programs like NUPLAZIDconnect but also included kickbacks to physicians for the purpose of inducing them to prescribe NUPLAZID; and (iii) these improper business practices raised a risk that Acadia would face regulatory scrutiny and attract negative attention from industry watchdogs.

77. On a May 2, 2016 analyst conference call to discuss the FDA's approval of NUPLAZID, Defendant Davis stated in relevant part:

> The unique pharmacology of NUPLAZID establishes a new class of drug, selective serotonin inverse agonists, or SSIA, by not only preferentially targeting 5-HT2A receptors, but also avoiding activity at dopamine and other receptors commonly targeted by antipsychotics. ***With this novel mechanism NUPLAZID significantly reduces the hallucinations and delusions in patients with PDP and, importantly, does so without impairing motor function.***
>
> Defendant Stankovic further stated:
>
> Notably, 65% of patients taking NUPLAZID experienced a three-point or greater improvement on the SAPS-PD scale, compared to 42% on placebo. Around 14% of patients taking NUPLAZID achieved a

> complete response or a full resolution of their PD psychosis symptoms on the SAPS-PD scale compared to 1% on placebo. ***Importantly, due to NUPLAZID's novel and unique mechanism of action this benefit was achieved without impacting motor function, an additional important feature prominently described in the label.***
>
> ***Let me now turn to key safety information described in the NUPLAZID label. Similar to all other antipsychotics, NUPLAZID was approved with a class label box warning noting that elderly patients with dementia related psychosis treated with antipsychotic drugs are at an increased risk of death.***
>
> ***
>
> ***In regards to adverse events, the most common adverse reaction, defined as greater than or equal to 5% and twice the rate of placebo, included in the label were peripheral edema and confusional state.***

While touting the "unique pharmacology" of NUPLAZID and safety comparisons during clinical testing, Defendants misled the market by not simultaneously revealing that because of NUPLAZID' high death rate and overall troubling safety profile they developed a marketing and commercialization plan that included enticing doctors with sizable payoffs to prescribe the drug to their patients rather than off-label alternatives, thereby raising a risk of scrutiny from regulators and industry watchdogs.

78. Next, Defendant Moore described Acadia's "***well-designed plan***" to successfully commercialize and launch NUPLAZID, and to convince physicians to prescribe NUPLAZID to their patients, as well as certain obstacles to successful commercialization. The plan Defendant Moore described included, "***market education***," "***increase[ing] awareness***" among ***"the approximately 11,000 key***

***physicians we have identified as PDP treating physicians***," "***onboard[ing] 132 new employees as neuroscience sales specialists***," and "***direct educational efforts with a variety of multi-channel education activities***." The obstacles Defendant Moore identified were that, "***[a]mong PD patients, the frequency of doctor visits varies from monthly to every six months***," and "***[m]any physicians may want to see how NUPLAZID works on one or two of their patients to gather first-hand experience with the product***." Later in the call, in response to analyst questions, Defendant Davis similarly ***described commercialization efforts involving the 132 representatives hired to target physicians, as well as an extensive sampling program for physicians to "see firsthand how the drug works in their hands."*** In describing these commercialization efforts, Defendants Moore and Davis glaringly failed to reveal that the lynchpin of their successful commercialization plan included sizable payments to physicians to motivate them to prescribe NUPLAZID despite the astronomical death rate, and despite the availability of potentially safer off-label alternatives, which raised a risk that Acadia would face regulatory scrutiny.

79. Indeed, far from revealing the difficulty in convincing physicians to prescribe a product with a high death rate, especially given its questionable efficacy, Defendant Moore speciously represented on the call that "the ability to educate physicians may be just a little bit easier because they are eager for a

solution."

80. Moreover, while declining to provide "quantitative guidance" on this call, Defendant Davis described the key components of Acadia's gross to net adjustments:

> … while we won't be providing quantitative guidance at this time on gross to net adjustments, I can describe the ***key components of what will be included in these adjustments. And they include, fees paid to our specialty pharmacies and distributors; rebates and charge backs associated with government programs including our share of the doughnut hole for Medicare Part D patients; patient assistance to eligible privately insured patients; and any product returns.***

Defendant Davis misleadingly did not include payouts to physicians as inducement to prescribe NUPLAZID in the list of "gross to net adjustments."

81. The following day, on May 3, 2016, a mere four days after announcing the FDA's approval of Acadia's first drug, Acadia filed a Form 8-K with the SEC announcing that three members of its Board of Directors were leaving – two having opted not to run for re-election, and one having resigned.

82. On May 5, 2016, Acadia hosted an analyst call to discuss its first quarter results for 2016. On that call, Defendant Davis repeated prior representations regarding NUPLAZID's purported advantage of reducing hallucinations and delusions while "***not impairing motor function in PDP patients***," and once again described the Company's commercialization strategy: "***to educate healthcare providers on NUPLAZID, ensure patient access to NUPLAZID and work with payers to secure reimbursement***," without also

revealing Acadia's payouts to doctors to motivate them to prescribe NULAZID despite its deleterious safety profile. Indeed, far from detailing the impact of NUPLAZID's troubling death rate on Acadia's commercialization efforts, Defendant Davis portrayed the drug's safety profile as positive and pointed to the "***favorable safety profile***" as a consideration in pricing the drug:

> ***And we also felt like it was important to consider the safety and tolerability profile of the drug. We think it has a very overall favorable safety profile and tolerability profile and we thought that was an important consideration.***

83. Defendant Moore similarly touted NUPLAZID's safety as compared to off-label alternatives, stating, "***For the first time, physicians can treat the hallucinations and delusions associated with PDP without impairing motor function***." Defendant Moore also repeated the statements regarding physician education and commercialization efforts set forth in ¶¶ 78, 82. The foregoing statements were false and misleading for the reasons set forth in ¶¶ 78, 79, 82 and 130. Additionally, in response to an analyst question, Defendant Moore described Defendants' plan to get physicians to prescribe NUPLAZID:

> ***Well, our market message revolves around our indication and the benefits we provide and it's up to the physician to decide, but clearly we have advantages over existing therapies and there are good reasons for physicians to consider switching their patients***.

Defendant Moore did not reveal that improper payments in contravention of federal regulations were included in the "***market message***" Acadia used to provide "***good reasons for physicians to consider switching their patients***" and prescribe a

dangerous drug like NUPLAZID, despite the significant safety disadvantage, and that such machinations created an untenable risk of regulatory scrutiny.

84. On May 31, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Announces NUPLAZID™ (pimavanserin) Is Now Available for the Treatment of Hallucinations and Delusions Associated with Parkinson's Disease Psychosis." Therein, the Company once again ***hyped the drug and lauded its safety as compared to off-label alternatives Parkinson's disease therapy***. Specifically, the press release stated, in relevant part:

> NUPLAZID is also the only drug approved by the FDA that preferentially targets 5-HT2A receptors. These receptors are thought to play an important role in Parkinson's disease psychosis. The unique pharmacology of NUPLAZID establishes a new class of drug - selective serotonin inverse agonists (SSIA) - by not only preferentially targeting 5-HT2Areceptors but also avoiding activity at dopamine and other receptors commonly targeted by antipsychotics. Typical Parkinson's disease therapy consists of drugs that stimulate dopamine to treat patients' motor symptoms such as tremor, muscle rigidity and difficulty with walking. ***NUPLAZID does not interfere with patients' dopaminergic therapy and therefore does not impair their motor function.***
>
> ***"I am delighted that we now have an effective and FDA-approved therapy for patients with hallucinations and delusions associated with Parkinson's disease psychosis," said Neal Hermanowicz, M.D., Health Sciences Clinical Professor, Neurology, UC Irvine Movement Disorders Program. "In the pivotal Phase III study of NUPLAZID, we observed significant reductions in the severity and frequency of hallucinations and delusions in patients with Parkinson's disease psychosis. Importantly, these benefits were achieved without impairing motor function."***

85. The foregoing statements focusing on the purported safety benefits of

NUPLAZID while failing to reveal that the drug's disturbing safety profile in fact led Defendants to pay off physicians to induce prescription writing, were false and misleading for the reasons stated in ¶¶ 76, 132. Moreover, though including a lengthy quote from Dr. Hermanovicz in the press release to further tout the drug, Defendants failed to reveal that their kickback campaign included Dr. Hermanovicz as one of the chief recipients of their massive payouts (*see* ¶¶ 11, 13, 69, 73).

86. On July 29, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Second Quarter 2016 Financial Results." Therein, the Company reported on the approval of NUPLAZID and ***commercialization efforts to date***. The press release explained that, "***we are expanding awareness of NUPLAZID among healthcare professionals through a number of initiatives including speaker programs, media and digital campaigns, and symposia at major medical meetings; and we are working with payors to make NUPLAZID available to eligible patients***." However, Defendants did not explain that, due to NUPLAZID's troubling death rate, their commercialization efforts included business practices likely to attract regulatory (and other) scrutiny, such as payments to physicians to motivate them to prescribe NUPLAZID over potentially safer off-label alternatives.

87. Demonstrating the criticality of NUPLAZID to Acadia's bottom line,

the Company admitted in the press release that while it reported net product sales of $97,000 for the three months ended June 30, 2016, it had "no similar net product sales… for the comparable period of 2015" prior to NUPLAZID's approval and commercialization.

88. On August 4, 2016, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2016. The Company's 10-Q was signed by Defendant Davis and included statements regarding Acadia's commercialization and marketing strategy:

> ***Included in our strategy in the United States is employing our internal specialty sales force to commercialize NUPLAZID for the treatment of PDP.***
>
> ***
>
> ***Additionally, our strategy in the United States includes distributing NUPLAZID solely through a limited network of third-party specialty distributors and pharmacies.***

89. That same day, Acadia hosted an analyst conference call to discuss the quarterly results, and NUPLAZID's recent May 31, 2016 launch. On the call, Defendant Davis detailed the expenses Acadia incurred—leaving out the expense of paying physicians to induce prescriptions of NUPLAZID. Moreover, Defendant Davis stated that, "[o]perationally, the launch of NUPLAZID has gone very well and ***we are executing on our plans to bring NUPLAZID to patients in need***." ***Davis went on to discuss those plans in great detail, covering initiatives such as onboarding and training sales specialists, Acadia's NUPLAZID connection***

***patient and physician support system, speaker program and digital and media campaigns, "a strong presence at medical meetings with product symposia at the American Psychiatric Association Annual Meeting held in mid-May and at the 20th International Congress of Parkinson's Disease and Movement Disorders held in mid-June," and hosting a NUPLAZID national broadcast webinar featuring experts in the field of PD psychosis***. Davis emphasized that, "***our key commercial priorities are to broaden awareness in NUPLAZID to ensure patient access*** and work with payers to secure reimbursement." Defendant Moore similarly ***provided a comprehensive report on commercialization efforts***, echoing statements he made on previous conference calls, and further stating that "***we are executing on a commercialization plan that is focused on broadening awareness of NUPLAZID, ensuring patient access and achieving broad coverage***… ***It's a matter of getting the right message to the right physician with the right amount of frequency***."

90. Moreover, during the call an analyst asked whether "physicians and patients are happy with the efficacy or safety profile," in response to which Defendant Davis stated:

> ***Yes… based upon the anecdotes that we have had and frankly based upon all the data that we are evaluating, we are very pleased to see it appears both on the side effects and tolerance side as well as on the efficacy side, everything is supportive of the profile that we – that the drug demonstrated in clinical trials.*** That's not always the case. So that's very helpful and the anecdotes have been very consistent

> with the kind of anecdotes that we had and the kind of experience we had in the clinic.

91. The foregoing statements on August 4, 2016 were false and misleading for the reasons stated in ¶¶ 76, 132.

92. On November 7, 2016, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Third Quarter 2016 Financial Results." Therein, Defendant Davis touted prescription growth for NUPLAZID and commercialization efforts:

> ***We saw solid month-over-month prescription growth***, reported increased payor coverage, and ***continued to expand awareness of NUPLAZID among movement disorder specialists, neurologists, and psychiatrists***.

93. The foregoing statements were false and misleading for the reasons stated in ¶ 132.

94. On November 7, 2016, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2016. The Company's 10-Q was signed by Defendant Young and repeated the statements regarding Defendants commercialization and marketing strategy set forth in ¶ 88. Moreover, while detailing NUPLAZID's black box warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, Defendants did not reveal that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

95. That same day, Acadia held an analyst earnings call to discuss the

third quarter 2016 results. On the call, Defendant Davis touted the Company's commercialization efforts without revealing that those efforts included improper payments to physicians to induce prescriptions of NUPLAZID. Specifically, Defendant Davis stated, in part:

> ***…our sales specialists have made excellent inroads in broadening and deepening awareness of NUPLAZID and are getting good access to physicians, including neurologists and psychiatrists.***
>
> ***Through our market research and feedback from our sales specialists we have received strong positive feedback from physicians, who have prescribed NUPLAZID and about their intent to prescribe in the future.***
>
> ***
>
> ***We see steady rates with new patient startings and continuing growth in the number of prescribing physicians and patients on NUPLAZID.***
>
> ***
>
> ***The safety and tolerability profile was consistent with what we observed in the clinical studies, and on the efficacy front we are hearing from physicians that they are very pleased with the efficacy of NUPLAZID.***

Later on the call, Defendant Moore stated, "***we are seeing steady adoption by physicians with consistent additions of new [writers] each week through the launch…" and that "In addition, our messages are resonating with physicians.***"

96. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

97. On the same call, Defendant Young described gross to net

adjustments as including "***fees paid to specialty pharmacies and specialty distributors, rebates and chargebacks associated with government programs, including our share of the donut hole for Medicare Part D patients, patient assistance to eligible privately insured patients and any product returns***." Defendant Young also detailed the "***expense side of the P&L***." At no point in discussing the gross to net adjustments or expenses did Young reveal the cost of paying off physicians to prescribe NUPLAZID despite its extremely high death rate.

98. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

99. On February 28, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Financial Results for the Fourth Quarter and Year Ended December 31, 2016." Therein, the Company repeated prior representations regarding NUPLAZID and its ***commercial launch***. Further confirming the financial significance of NUPLAZID to Acadia, the Company also reported net product sales of $12.0 million for the fourth quarter of 2016 and made clear that there were no similar product sales for the comparable quarter of 2015."

100. On February 28, 2017, Acadia filed its annual report with the SEC on Form 10-K for the year ended December 31, 2016. The Company's 10-K was signed by Defendant Davis and once again detailed NUPLAZID's black box

warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, without revealing that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

101. That same day, the Company held a conference call for analysts on which Defendant Davis touted the "strong progress of the launch" and stated, "***During the quarter, we continue to observe a steadily growing number of patients starting therapy, together with the growing number of prescribers including repeat prescribers***." Davis further stated, "***we've received favorable feedback from physicians on the clinical profile of NUPLAZID including its efficacy and favorable safety profile***..." Defendant Young ***discussed expenses***, without revealing Acadia's improper payments to physicians. Defendant Moore hyped NUPLAZID's commercialization success without mentioning the improper inducement payments to physicians in contravention of federal regulations, stating:

> ***we have had a strong introduction of NUPLAZID into the marketplace and are pleased by the solid uptake we saw in our second full-quarter commercialization. The use of NUPLAZID increased across all targeted segments with regular adaption occurring among movement disorder specialists. This was expected given the high density of PD psychosis patients these additions treat.***
>
> ***
>
> ***Currently, NUPLAZID prescriptions are approximately 70% switches from current therapy and approximately 30% are treatment of naïve patients.***

Defendant Moore also identified "***educating key prescribers on the benefits of NUPLAZID and differentiating NUPLAZID based on improvement efficacy without impact-to-motor symptoms and a favorable safety and tolerability profile in frail elderly patients***," as a "***crucial initiative***" of the commercialization strategy.

102. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

103. On May 9, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports First Quarter 2017 Financial Results." Therein, Defendant Davis attributes expanded use of NUPLAZID to brand awareness without revealing the kickback scheme, stating in relevant part:

> ***The use of NUPLAZID® in Parkinson's disease psychosis continues to expand as brand awareness among neurologists, psychiatrists, and other healthcare providers grows.***

104. That same day, Acadia also filed its quarterly report with the SEC on Form 10-Q for the quarter ended March 31, 2017. The Company's 10-Q was signed by Defendant Young and once again detailed NUPLAZID's black box warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, without revealing that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

105. The foregoing statements were false and misleading for the reasons

stated in ¶¶ 76, 132.

106. Also on May 9, 2017, the Company held a conference call during which Defendant Young ***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID. Moreover, Defendant Davis stated,

> ***During the quarter, we continue to see an increase in new prescribers and patients and an increase in the number of repeat prescribers.***
>
> ***
>
> ***[W]e continue to observe strong foundational elements that support NUPLAZID's growth and its potential to grow attractively in the quarters and years to come***.

Davis also stated on the call that, "***The drug has performed almost exactly the same in the marketplace as we expected based upon the clinical profile of the drug. Same on efficacy, same on side effect and tolerability profile***." Indeed, Defendant Davis spoke about physicians that Acadia is "***actively seeking to influence… to use NUPLAZID***" but described such influences as, "***it's really the safety and efficacy and the performance of the product thus far… a majority of physicians in this case are satisfied, so there's a high satisfaction, a high intent to use because of the product is performing exact as the way it was promised,***" rather than divulging that such "***influence***" included improper payments that triggered a risk of regulatory scrutiny.

107. Also on the call, further describing NUPLAZID's growth, Defendant

Yang stated that, "***Importantly, 88 % of the physicians surveyed who are aware of NUPLAZID intend to increase their future use for PD Psychosis***."

108. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132, and failed to reveal that Defendants secured that "intent" with improper payments that raised a risk Acadia would face regulatory scrutiny.

109. On August 8, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Second Quarter 2017 Financial Results." Therein, the Company once again discussed commercialization efforts for NUPLAZID. The same day, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2017. The Company's 10-Q was signed by Defendant Young and once again detailed NUPLAZID's black box warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, without revealing that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

110. The Company also held a conference call that day during which Defendant Young ***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID. Moreover, Defendant Davis falsely stated on the call, "***So overall, patients are having a positive experience with NUPLAZID. They like the way the drug works. They are tolerating the***

***medication very well***." In reality, Defendants well knew, or were reckless in not knowing, that there were mounting reports of deaths of patients who had been prescribed NUPLAZID, and that they had to pay off physicians to induce them to prescribe this deadly drug.

111. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

112. Also on the call, Defendant Yang discussed efforts to generate additional prescriptions of NUPLAZID, stating, in part, "***We continue to focus significant effort on working with physicians to identify appropriate new patients… We're still getting new patients every week, every month and moving more those physicians from trial and dabblers into stronger adopters, so a lot more that we can still accomplish***." Yang further stated, "***We find the drug and the physicians find the drug to be well tolerated and that is overcoming one of the most important elements when we look at our market research***," but did not reveal the mounting adverse event reports or explain that this "***effort***" included improper payments to physicians to convince them to prescribe NUPLAZID despite it's troubling safety profile and despite the resulting risk of regulatory scrutiny.

113. On November 7, 2017, Acadia issued a press release entitled "Acadia Pharmaceuticals Reports Third Quarter 2017 Financial Results." Therein, the

Company once again reported on growth and ***commercialization of NUPLAZID***. The Company also filed its quarterly report with the SEC that day on Form 10-Q for the quarter ended September 30, 2017. The Company's 10-Q was signed by Defendant Young and once again detailed NUPLAZID's black box warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, without revealing that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

114. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

115. The same day, the Company held a conference call to discuss its quarterly results during which Defendant Young ***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID. Moreover, Defendant Davis stated, "***On the commercial side, we are seeing important progress on multiple fronts. Access to NUPLAZID remains strong. The feedback from physicians, advocacy groups in the Parkinson's community and patients and caregivers continues to be very positive. We continue to make strong progress on our promotional efforts for NUPLAZID with increased brand awareness***." Defendant Yang further discussed these efforts, stating, "***We are***

***working closely with healthcare practitioners to identify appropriate new patients***."

116. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

117. On February 27, 2018, Acadia filed its annual report with the SEC on Form 10-K for the year ended December 31, 2017. The Company's 10-K was signed by Defendant Davis and once again detailed NUPLAZID's black box warning regarding an ***increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***, without revealing that Dr. Andreason's warnings had come to fruition and that there were already mounting reports of deaths in patients taking NUPLAZID.

118. In a conference call the same day, Defendant Young ***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID. Defendant Davis touted NUPLAZID's successful commercialization, attributing it to:

> ***Continued growth day after day in the number of patients taking NUPLAZID; growth in the number of physicians prescribing NUPLAZID, including at academic centers, and community practices and in long-term care facilities; greater depth with position, that is individual physicians prescribing NUPLAZID to a higher number of their patient; market research results that consistently continue to demonstrate very high levels of physician and patient satisfaction with NUPLAZID, including physician intent to prescribe more; and finally, we continue to enjoy very high levels of access.***

119. The foregoing statements were false and misleading for the reasons

stated in ¶¶ 76, 132.

120. Moreover, Defendant Stankovic hyped NUPLAZID's safety profile as compared to other antipsychotic medications, stating, "***Pimavanserin also have the favorable tolerability profile. In contrast, other antipsychotic tier significant side effects and tolerability issues***." These statements were false because there were mounting reports of deaths of patients treated with NUPLAZID.

**<u>The Truth Regarding NUPLAZID's Post-Commercialization Safety Issues is First Revealed and Defendants Continue to Mislead Investors</u>**

121. On April 9, 2018, CNN reported that "[p]hysicians, medical researchers and other experts told CNN that they worried that [NUPLAZID] had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks." In greater part, the article stated:

> Nuplazid's review was being expedited because it had been designated a "breakthrough therapy" -- meaning that it demonstrated "substantial improvement" in patients with serious or life-threatening diseases compared to treatments already on the market. Congress created this designation in 2012 in an effort to speed up the FDA's approval process, which has long been criticized for being too slow. Around 200 drugs have been granted this designation since its creation.
>
> Still, to recommend approval, the advisory committee would have to find that the drug's potential benefits outweighed its risks for its intended patients.
>
> Some FDA officials concluded that Nuplazid's public health benefit was enough to merit approval of the drug. Their argument echoed the pleas of family members and caregivers like Tyne: It could possibly help patients with no other alternative. Several of the people who

spoke said their loved ones had been transformed during the clinical trials, though some said there was no way for them to know whether they were on Nuplazid or a placebo.

But the physician who led the FDA's medical review, Dr. Paul Andreason, warned that patients taking the drug during the company's clinical trials experienced serious outcomes, including death, at more than double the rate of those taking the placebo. The company's limited testing, he said, had not convinced him that the benefits outweighed the risks.

While Tyne had heard about these risks, he said he "discounted death as a real statistical possibility" and was willing to try anything to help his mother.

"I have two young children who love their grandmother," he told the committee. "If nothing is done to bring her back to some semblance of normalcy, my children will never remember their grandmother for who she is: a loving, funny, caring woman who has improved the lives of all of the loved ones who surround her. Please, I beg you, do not deprive my children and their grandmother of experiencing that love."

'You have to take it seriously'

The committee voted 12-2 and recommended that the FDA approve Nuplazid for the treatment of Parkinson's disease psychosis based on a six-week study of about 200 patients. Three previous studies of the drug did not show that it was effective, Andreason said in his medical review, though they showed similar risk.

Even some committee members who voted in favor of the drug expressed reservations, according to the hearing transcript. "I guess I'm hoping that the risks are going to be small, and I think the benefits for some of these people who are very sick and whose families are affected by this, I think they're probably willing to take that risk," one physician stated. Another committee member said she wouldn't have voted for the drug's approval if there had been a safe and effective alternative on the market. A third made a "plea" to the FDA to "consider a large observational study so we can ensure that, once it goes into real-world use, that the benefits will outweigh the risks."

It hit the market in June 2016. As caregivers and family members

rushed to get their loved ones on it, sales climbed to roughly $125 million in 2017.

Tyne got his mother on the drug as soon as it became available. But after trying it for months, he says he was devastated to see that it was doing nothing to halt the awful progression of the disease, and her hallucinations became more frequent and harder to manage. "She has gone straight downhill to the point she really can't function at all," he said.

Shortly after the drug's release, patients' family members, doctors and other health care professionals started reporting "adverse events" possibly linked to the medication -- including deaths, life-threatening incidents, falls, insomnia, nausea and fatigue. In more than 1,000 reports, patients continued to experience hallucinations while on Nuplazid.

In November, an analysis released by a nonprofit health care organization, the Institute for Safe Medication Practices, warned that 244 deaths had been reported to the FDA between the drug's launch and March 2017. The organization also noted that hundreds of reports suggested the drug was "not providing the expected benefit" or potentially worsening the condition.

Tracked by the FDA, these so-called "adverse event reports" document deaths, side effects and other issues, and can be made directly by consumers, caregivers and other medical professionals. Reports are submitted to either the FDA or to the drugmaker, which is required to pass along any it receives to the federal government. In some cases, the person filing the report is convinced the side effects were caused by the drug; in others, the reporter ascribes no cause but notes that the patient was on the drug.

An adverse event report does not mean that a suspected medication has been ruled the cause of harm and is typically not the result of an official investigation. But the FDA uses the information to monitor potential issues with a drug and can take action as needed -- updating a medication's label, for instance, or restricting its use or pulling it off the market.

After analyzing the adverse event data for Nuplazid, the Institute for Safe Medication Practices concluded that this batch of reports

> "reinforces the concerns of those who warned that (Nuplazid) might do more harm than good." Thomas Moore, senior scientist for drug safety and policy for the nonprofit, said the deaths are an "important warning signal" and warrant further review by the FDA -- and possible action, depending on what the review finds.
>
> Since the institute released its analysis, FDA data shows that the number of reported deaths has risen to more than 700. As of last June, Nuplazid was the only medication listed as "suspect" in at least 500 of the death reports.
>
> Physicians, medical researchers and other experts told CNN that they worried that the drug had been approved too quickly, based on too little evidence that it was safe or effective. And given these mounting reports of deaths, they say that more needs to be done to assess Nuplazid's true risks.
>
> "This is almost unheard of, to have this many deaths reported," said Diana Zuckerman, founder and president of the nonprofit think tank the National Center for Health Research, adding that because reports are voluntary, potential problems may be underreported. "You just don't see this with most new drugs -- you don't see all these reports -- so you have to take it seriously."

122. Given that the average investor cannot easily decipher the raw data regarding adverse events and deaths located on the FAERS database, as the FDA itself has stated, the CNN article provided the first revelation of NUPLAZID's troubling post-commercialization safety issues. As a result, on this news, Acadia's stock price fell $5.03 per share, or 23.4%, to close at $16.50 per share on April 9, 2018, on unusually heavy trading volume.

123. In an attempt to mitigate the damning data set forth in the CNN article, downplay the news of mounting adverse event reports, and convince the market that NUPLAZID has an acceptable benefit/risk profile, Acadia issued a

press release on April 10, 2018 entitled "Acadia Statement Regarding the Efficacy and Safety of NUPLAZID." Therein, the Company stated:

> ***The safety of patients has always been, and continues to be Acadia's top priority*. *NUPLAZID® was approved by the FDA for the treatment of hallucinations and delusions associated with Parkinson's disease psychosis (PDP) based on a pivotal Phase 3 study and other supportive studies that demonstrate its efficacy and safety***. The clinical development program for NUPLAZID involved 25 clinical studies in greater than 1,200 patients, comprising over 600 PDP patients (with approximately 170 patients treated for at least two years), thus presenting the largest clinical safety database in PDP patients to date. ***We continually analyze new data to ensure the safety of NUPLAZID and the ongoing evaluation has revealed no change in the benefit/risk profile described in the NUPLAZID Prescribing Information.***
>
> Approximately one million people in the United States live with Parkinson's disease. More than 50 percent of them will experience PDP symptoms over the course of the disease. As the only drug currently approved by the FDA for the treatment of hallucinations and delusions associated with PDP, NUPLAZID is filling an important and previously unmet need and offers hope to those with PDP and the people who care for them. We remain confident in the efficacy and safety of NUPLAZID that supported its approval by the FDA and stand firmly behind it.

124. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

## The Risk of FDA Scrutiny Due to Mounting Safety Issues Materializes and Defendants Continue to Mislead Investors

125. On April 25, 2018, CNN reported that the FDA was re-examining the safety of NUPLAZID. In greater part, the article stated:

> The Food and Drug Administration says it is re-examining the safety of a medication that was approved despite concerns that not enough

was known about the drug's risks.

In response to questioning at a budget hearing last week, FDA Commissioner Scott Gottlieb told members of Congress that he would "take another look" at Nuplazid, which is the only drug approved to treat hallucinations and delusions associated with Parkinson's disease psychosis. The medication has been cited as a so-called "suspect" medication in hundreds of deaths voluntarily reported by caregivers, doctors and other medical professionals since it hit the market, as highlighted in a recent CNN report.

The FDA told CNN this week that the agency had already begun conducting a new evaluation of the medication when Gottlieb was questioned about it at the hearing. The agency said the review had started several weeks ago.

"What does it take for a drug like this to be taken off the market?" asked US Rep. Rosa DeLauro, a member and former chair of the congressional subcommittee responsible for funding and overseeing the FDA.

DeLauro pressed Gottlieb for answers on his agency's response to the safety concerns surrounding Nuplazid.

"How many more adverse events do we have to have reported? How many people, quite frankly, have to die? Why does the industry always take precedence over public health and safety?"

Tracked by the FDA, the adverse event reports cited by DeLauro do not mean that a suspected medication has been ruled the cause of harm and are typically not the result of official investigations. But the FDA uses the information to monitor potential issues with a drug and can take action as needed: updating a medication's label, for instance, or restricting its use. In rare cases, the agency can even pull a drug off the market.

When asked by CNN about what prompted the FDA's new evaluation of Nuplazid, the agency said the decision was based on a number of factors but wouldn't say what those factors were. Instead, it would only comment generally, saying that it identifies "potential signals of serious risk/new safety information" in part by using adverse event data and that the agency is not suggesting physicians stop prescribing

> the drug or take patients off of it while a safety evaluation is taking place.
>
> The FDA has noted that the death reports citing Nuplazid have typically involved elderly patients with advanced-stage Parkinson's disease who suffered from numerous medical conditions and often take other medications that can increase the risk of death.
>
> But physicians, researchers and other medical experts told CNN that the high number of reports deserved a closer look to determine whether they were related to the drug. They also recommended further testing of Nuplazid, worrying that the drug had been approved too quickly, based on too little evidence that it was safe or effective.

126. Given the Company's April 10, 2018 assurances regarding the drug's benefit/risk profile despite the CNN report, investors were shocked by news of the FDA's re-examination of NUPLAZID's safety. Acadia's stock price therefore fell $4.27 per share, or 21.9%, to close at $15.20 per share on April 25, 2018, on unusually heavy trading volume.

127. Once again assuming damage control mode, on April 27, 2018, Acadia published a statement entitled "Acadia Pharmaceuticals Issues Statement Reaffirming Benefit/Risk Profile of NUPLAZID." Therein, the Company, in relevant part, stated:

> NUPLAZID® (pimavanserin) is the only medicine approved in the United States to treat hallucinations and delusions associated with Parkinson's disease psychosis. NUPLAZID was approved by the FDA based on a pivotal Phase 3 study that demonstrated clinically robust and highly statistically significant efficacy, combined with other supportive studies. ***We are confident in NUPLAZID's efficacy and positive benefit/risk profile and stand firmly behind it.***
>
> ***Acadia's top priority has been, and continues to be, patient safety.***

NUPLAZID was approved and launched in 2016. ***As the manufacturer of a newly launched drug, we are routinely in contact with the FDA regarding requests for additional information on NUPLAZID, including postmarketing safety surveillance information as part of the FDA's ongoing safety monitoring.***

In a statement released to the media on April 10, 2018, the FDA stated, "The FDA continues to monitor adverse events reported with NUPLAZID that are submitted to the FDA Adverse Event Reporting System (FAERS). We have noted that the cases typically involve geriatric patients with advanced-stage Parkinson's disease, as well as numerous medical conditions, who are frequently taking concomitant medications with risks for serious adverse events, including death. Based on these data, the FDA has, at this time, not identified a specific safety issue that is not already adequately described in the product labeling."

On April 25, 2018, the FDA stated that its evaluation does not mean the Agency has determined the medicine has a new risk and does not suggest healthcare providers should not prescribe it nor that patients should stop taking the medication. The Agency also has confirmed this statement does not represent a change from the safety review and monitoring activities the FDA referred to in its statement of April 10. As always, we will continue to work with the FDA and medical community to answer any questions related to NUPLAZID.

***Acadia collects and analyzes postmarketing events for NUPLAZID as part of our ongoing commitment to monitor the medication's safety profile.*** These events are submitted to the FDA and incorporated into the FDA's FAERS public reporting system. Because NUPLAZID is distributed through a specialty distribution channel, we have frequent (in most cases monthly) contact with patients and caregivers through our distribution partners. This increased interaction naturally results in dramatically higher adverse event collection and reporting compared to products without such a distribution method. Approximately 93 percent of the reported adverse events associated with NUPLAZID are considered "solicited" due to this direct interaction with patients and caregivers, while only approximately 7 percent of these events are considered "spontaneous" reports, which are voluntary reports originating from consumers or healthcare professionals. In contrast, most other antipsychotics are distributed

through retail channels, which rely almost entirely on "spontaneous" reporting. Consequently, only a small fraction of actual adverse events are collected for these drugs.

128. While admitting to their awareness of all adverse event reports, Defendants still hid the fact that as a result of this knowledge of mounting deaths and adverse events, Acadia's commercialization efforts during the Class Period included payouts to physicians to induce them to prescribe NUPLAZID as opposed to other off-label alternatives, which raised a risk that Acadia would face regulatory scrutiny.

129. On May 4, 2018, Acadia issued a press release entitled "ACADIA Pharmaceuticals Reports First Quarter 2018 Financial Results." Therein, Defendant Davis attributed the Company's positive financial results to the fact that, "***health care providers and patients continue to experience the benefits of NUPLAZID in treating the symptoms of Parkinson's disease psychosis***." Also, on May 4, 2018, Acadia filed its quarterly report with the SEC on Form 10-Q for the quarter ended June 30, 2016. The Company's 10-Q was signed by Defendant Young and stated that NUPLAZID contained a black box warning indicating that ***there is an increased risk of death in elderly patients with dementia-related psychosis treated with antipsychotic drugs***. The warning did not state that the risk of death was higher for NUPLAZID as compared to other antipsychotic drugs, that patients with PD Psychosis were also at greater risk of death even if they did not

suffer from dementia, and did not reveal that there were already mounting reports of deaths in patients taking NUPLAZID.

130. The foregoing statements were false and misleading for the reasons stated in ¶¶ 76, 132.

131. The same day, the Company held a conference call with analysts during which Defendants Davis and Young ***described Acadia's expenses*** without revealing the improper payments to physicians to prescribe NUPLAZID. Moreover, ***Defendant Stankovic reiterated Defendants' previous statements regarding NUPLAZID's safety***, and confirmed their consistent efforts to stay apprised of safety issues:

> ***Since, approval and launch in 2016, ACADIA has monitored NUPLAZID's safety throughout this period in robust of pharmacovigilance activities.*** We're also continuously evaluating the benefits and risks of pimavanserin treatment in our ongoing clinical studies, both in placebo-controlled and the open-label long-term safety trials.
>
> ***Based on this ongoing evaluations and the totality of currently available information, we maintain our assessment that the benefit risk profile for NUPLAZID remains unchanged and it is appropriately described in the product labeling***.

132. The above statements identified in ¶¶ 75-131 were materially false and/or misleading, and failed to disclose material adverse facts, including: (i) mounting reports of post-commercialization adverse events, serious adverse events, and deaths in patients using NUPLAZID, raised the risk that the FDA would reevaluate the drug's safety or, at minimum, that industry watchdogs would

warn against prescribing the drug; (ii) as a result of NUPLAZID's deleterious safety profile, marginal efficacy, and the availability of off-label alternatives, Acadia's marketing strategy included payments to physicians for the purpose of inducing them to prescribe NUPLAZID; and (iii) these improper business practices, in contravention of federal regulations, raised a risk that Acadia would face regulatory scrutiny.

## **The Truth is Revealed**

133. On July 9, 2018, SIRF published a report entitled "Acadia Pharmaceuticals: This Is Not a Pharmaceuticals Company." Therein, SIRF stated that "evidence is mounting that something is horribly wrong with Acadia's sole drug, Nuplazid, an antipsychotic for Parkinson's disease patients who experience episodic hallucinations and delusions" and that "Acadia has accomplished its growth in ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths."

134. After detailing NUPLAZID's questionable efficacy results given three busted trials, the lax and expedited approval process NUPLAZID enjoyed given its "Breakthrough Therapy Designation," an admission by the FDA's division director of psychiatry products "that awarding the breakthrough designation hinged on the fact that no other FDA-approved drugs existed for treating Parkinson's disease psychosis, as well as the frequency that these patients were being placed in nursing

homes, which he called "a harbinger of death," and Dr. Andreason's scathing recommendation against approval, the SIRF report went to describe the shocking lengths to which Acadia opted to go to ensure physicians prescribed NUPLAZID to their patients, despite the dire mortality rate:

> Over the six months that Nuplazid was commercially available in 2016, Acadia spent $609,556 on consulting, speaking and travel and lodging payments to 1,578 doctors: Pomona, New York, psychiatrist Dr. Leslie Citrome's $25,690 payout amounted to the largest sum, followed by the $19,142 paid to Dr. Khashayar Dashtipour, a Loma Linda, California based neurologist.
>
> But what a difference a year makes.
>
> For 2017, Acadia paid more than $8.6 million to 7,051 physicians, with 62 doctors receiving more than $50,000 apiece, and 26 receiving at least $100,000 each.
>
> The leading recipient of Acadia cash last year was Dr. Neal Hermanowicz, an Irvine, California-based movement disorders specialist who took in $180,123, a handsome improvement over 2016's $10,421. The runner up was psychiatrist Dr. Jason Kellogg, of Santa Ana, California, who was paid $166,259. (In contrast, the $25,690 that Dr. Citrome received in 2016, which was the biggest payout for that year, would have ranked as only the 104th largest payment to doctors if it had been given out in 2017.)
>
> Given the fact that Acadia hired a significant number of former Avanir sales staffers, a substantial number of doctors have ended up receiving consulting payments from both Avanir and Acadia in the same calendar year: A total of 31 did in 2017, as did 29 in 2016. Out of that group, a dozen doctors took in $5,000 apiece or more from the two companies in 2017. Just six did in 2016.
>
> Acadia's payments in 2017, according to the Centers for Medicare and Medicaid Services' Open Payments database, were almost entirely for consulting, save $522,935 for food and beverage expenses. (Other payment categories the centers track include "honorariums," such as fees for lecturing to other medical

professionals, or "education," when the company covers the expense of distributing a journal article or staging a presentation at a conference.) Despite Acadia's discussions about supporting research on Nuplazid, the company's appetite for external or independent research sharply declined last year. It spent just $197,587 on doctors' research projects, in contrast with its $817,613 outlay in 2016. (Avanir went in the other direction, devoting $7.61 million to research last year and $4.36 million to payments to doctors.)

Since Acadia doesn't release Nuplazid's prescription count, Medicare Part D data is the only way to observe prescriber behavior. To that end, overlaying Medicare Part D prescription volume from 2016 (the latest period for which data is available) against the Centers for Medicare and Medicaid Services Open Payments data for 2016 and 2017 illuminates a few things.

There's a good deal of overlap between those who received Acadia consulting fee payments in 2016 and 2017 and the individuals who prescribed Nuplazid with some frequency in 2016. For instance, in 2016, 14 of the 25 most frequent prescribers of Nuplazid to patients covered by Medicaid Part D received "consulting fees" in 2017 worth more than $1.21 million in total.

Almost 37 percent of Acadia's $1.21 million in consulting fee payments, or $443,014, went to three neurologists who conducted Acadia-funded studies on Nuplazid and published journal articles about their findings: Dr. Neal Hermanowicz; Dr. Stuart Hal Isaacson of Boca Raton, Florida; and Dr. Rajesh Pahwa of Kansas City, Kansas.

Pittsburgh-based Dr. Susan Baser, a leading prescriber of Nuplazid to patients paying for it via Medicaid Part D, told the Southern Investigative Reporting Foundation, "It's the only drug addressing [Parkinson's disease psychosis] and we've had positive effects in some patients." She added, "Personally I think it's a good drug despite the noise about adverse events that's out there."

Baser, who did not receive any consulting fees from Acadia in 2016 and 2017, expressed surprise at the size of the payments that some of her peers received from the company. "I work 60 hours per week. I

don't know how they have the time. I'm just too busy for any of that."[4]

135. On this news, Acadia's stock price fell $1.21 per share, or 6.8%, to close at $16.63 per share on July 9, 2018, on unusually heavy trading volume.

136. Post-Class Period, on November 28, 2018, the Company filed a prospectus supplement on Form 424B5. Buried within that filing, the Company included a single sentence revealing that ***two months prior***, in September 2018, Acadia "received a civil investigative demand, or CID, from the DOJ pursuant to the Federal False Claims Act requesting certain documents and information related to our sales and marketing of NUPLAZID."

137. Moreover, on March 27, 2019, the Institute for Safe Medication Practices ("ISMP") issued a report which called upon the FDA to reevaluate the drug, or at minimum, revise NUPLAZID's confusing black box warning. While the FDA indicated in September 2018 that it found "no new or unexpected safety risks associated with NUPLAID (pimavanserin)," the ISMP analyzed the data and concluded that "FDA Reassurance of Pimavanserin Not Warranted." The ISMP explained that the Company had provided the FDA with the data it used for its reexamination and that 39% of the death reports the FDA reviewed contained insufficient information to make an adequate assessment. Highlighting frightening

---

[4] The SIRF report also noted that Acadia had hired twenty-six employees from a Company called Avanir Pharmaceuticals, which had also engaged in unethical marketing strategies, including payments to physicians to induce off-label prescription writing.

safety signals, the ISMP noted that since the commercialization of the drug until September 2018 there had been 1,339 reported patient deaths. The ISMP concluded that:

> Our reassessment of the recent FDA analysis provides no new reassurance that the benefits of pimavanserin treatment outweigh its risks. Instead the post-market data and a new study warrant increased concern. FDA should re-evaluate whether evidence exists to show the benefits of pimavanserin outweigh its risks, and if it does, the agency should clarify the Boxed Warning to say plainly that these risks could apply to pimavanserin.

138. Acadia announced in its 10-Q for the quarterly period ended September 30, 2020, filed on November 4, 2020, that in October 2020 the DOJ informed the Company that it "would not be taking any further action related to the CID *at this time*" (emphasis added), it did not state that the Department of Justice had concluded that Defendants had not violated the Federal False Claims Act or that action would not be taken at a later date.

## LOSS CAUSATION

139. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

140. During the Class Period, Plaintiff and the Class purchased Acadia's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

141. The first corrective disclosure occurred on April 9, 2018 when CNN reported that mounting adverse event reports following NUPLAZID's commercialization suggested that the drug "does more harm than good," and had likely been approved by the FDA too quickly.

142. Adverse event data post commercialization can only be obtained from the FDA's Adverse Events Reporting System ("FAERS"), which was then only available by letter request with a response time of multiple weeks. As the FDA itself has stated, the FAERS data is not easily understandable by the average person but rather requires a degree of expert knowledge. Specifically, per the FDA, the FAERS data files contain only raw data and "[a] simple search of FAERS data ***cannot be performed*** with these files by persons who are not familiar with creation of relational databases." https://www.fda.gov/drugs/surveillance/fda-adverse-event-reporting-system-faers. Given that the average investor cannot easily decipher the raw data regarding adverse events and deaths located on the FAERS database, the CNN article provided the first hint of NUPLAZID's troubling post-commercialization safety issues. As a result, on this news, Acadia's stock price fell $5.03 per share, or 23.4%, to close at $16.50 per share on April 9, 2018, on unusually heavy trading volume.

143. To continue propagating their misleading narrative, Defendants issued a press release the day after the CNN article reiterating their misrepresentations

regarding the drug's safety and benefit/risk profile. The second corrective disclosure two weeks later, on April 25, 2018, therefore surprised the market further, when CNN reported that the FDA decided to re-examine the safety of NUPLAZID. Acadia's stock price therefore fell $4.27 per share, or 21.9%, to close at $15.20 per share on April 25, 2018, on unusually heavy trading volume.

144. The third and final disclosure occurred on July 9, 2018, when the SIRF published a report entitled "Acadia Pharmaceuticals: This Is Not a Pharmaceuticals Company." In its report, the SIRF stated that "evidence is mounting that something is horribly wrong with Acadia's sole drug, Nuplazid, an antipsychotic for Parkinson's disease patients who experience episodic hallucinations and delusions" and that "Acadia has accomplished its growth in ways that have attracted intense regulatory scrutiny for other drug companies" including "dispensing wads of cash to doctors to incentivize prescription writing and downplaying mounting reports of patient deaths."

145. The author of the SIRF report, Roddy Boyd, is an investigative journalist who has been identified by the Huffington Post as one of the twenty-five "Most Dangerous People in Financial Media" because "he's one of the few out there with the patience and the eye for detail that this type of work requires."[5] Mr.

[5]https://www.huffpost.com/entry/best-financial-journalists_b_1605584?slideshow=true&guccounter=1#gallery/5bb2c63ce4b0480ca65bce38/12

Boyd's credibility is undeniable. According to the SIRF website, Mr. Boyd has taught investigative reporting at the University of North Carolina at Chapel Hill, regularly leads seminars at Investigative Reporters & Editors conferences on financial statement analysis and fraud detection and has authored financial analysis books.[6] In fact, the SIRF website boasts that Mr. Boyd's work "has prompted numerous regulatory, civil and criminal actions."

146. SIRF's "About Us" page makes clear that its goal is to piece together information through "sleuthing," which is often buried, overlooked, or forgotten so that it can bring to light the "many ways" in which "investors, consumers, and market stakeholders are regularly misled":

> Our foundation produces substantive investigative reporting without fear or favor. These investigations bring to life important stories that are going untold, illuminating the many ways investors, consumers and market stakeholders are regularly misled. We accomplish this through carefully mining corporate legal and financial filings– such as a skillfully buried footnote inside a quarterly report, or an overlooked exhibit in a forgotten legal claim–which, when coupled with ample shoe leather reporting, presents the clearest possible picture of our subject.
>
> The hallmark of the foundation's reporting is a commitment to accuracy, the breadth of our news gathering and the clarity of our presentation. In doing this work, our goal is to conduct the foundation's business to meet or exceed the highest standards of non-profit governance and ethical journalism. To that end, apart from truth and increased knowledge, our work will be free of agenda. The completed investigations are published free of charge, without advertisements or sponsors.

---

[6] https://ffj-online.org/about-us.

147. Moreover, the SIRF makes clear that neither it, nor its authors – like Roddy Boyd – have any financial interest in the price movements of the securities they cover:

> We are funded solely through the tax-deductible contributions of individual donors and foundations, none of whom derive any professional or economic benefit from this support. No one, apart from the foundation's employees and our legal advisors, has any input to editorial decisions. The foundation's employees, directors and advisors will never benefit financially from the price movements in the securities or derivatives of companies mentioned in our journalism.

148. In support of its findings regarding Acadia's kickback scheme, the SIRF conducted a comprehensive in depth examination of data obtained from a variety of sources that the average investor would not have reason to access – particularly in light of the Company's misleading statements – including *inter alia* the FAERS database, Medicare Part D coverage data, the U.S. government's Open Payments database. The SIRF had to cull through, analyze, and decipher tens of thousands of entries in multiple databases by year, not typically frequented by average investors, to uncover Acadia's strategy of inducing physicians with sizable payouts to prescribe NUPLAZID despite its deleterious safety profile. Absent the SIRF report, the market would not have learned about the kickback scheme. Indeed, even the DOJ failed to take notice of the Company's machinations until the publication of the SIRF's analysis.

149. After the market learned of Acadia's kickback scheme for the first

time via Roddy Boyd's SIRF article, Acadia's stock price fell $1.21 per share, or 6.8%, to close at $16.63 per share on July 9, 2018, on unusually heavy trading volume.

## SCIENTER ALLEGATIONS

150. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acadia, their control over, and/or receipt and/or modification of Acadia's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Acadia, participated in the fraudulent scheme alleged herein.

151. Specifically, Defendants had access to data showing that Acadia made huge payments to physicians that prescribed NUPLAZID with frequency, a practice prohibited by statutes with which Defendants conceded familiarity. The PPACA requires companies to report all transfers of value to physicians to the

government on an annual basis. Defendants also had a legal obligation to submit this data to the Center for Medicare and Medicaid Services (CMS). The Company has stated that two thirds of prescriptions are under Medicare Part D plans and some of the remainder are under Medicaid.

152. Moreover, NUPLAZID is Acadia's only source of revenue. Defendants therefore placed their undivided focus on successfully commercializing NUPLAZID.

153. The Company acknowledged that a negative safety profile could deter physicians from prescribing the drug, sounding a certain death knell for the Company given its lack of alternative revenue sources, and its inability to date to secure approval for NUPLAZID to treat any other condition aside from PD Psychosis despite multiple attempts.

154. Defendants also admitted to tracking adverse events throughout the Class Period. Defendants Moore and Davis repeatedly acknowledged their involvement in the commercialization strategy for NUPLAZID on analyst calls throughout the Class Period.

155. Additionally, a mere four days after the FDA approved NUPLAZID – the Company's first marketable product in its entire existence – three members of Acadia's Board of Directors resigned.

## CLASS ACTION ALLEGATIONS

156. Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Acadia securities between April 29, 2016 and July 9, 2018, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

157. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Acadia's common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Acadia shares were traded publicly during the Class Period on the NASDAQ. As of January 31, 2018, Acadia had 124,701,944 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Acadia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful

conduct in violation of federal law that is complained of herein.

159. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

160. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Acadia; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

161. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

162. The market for Acadia's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Acadia's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Acadia's securities relying upon the integrity of the market price of the Company's securities and market information relating to Acadia and have been damaged thereby.

163. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Acadia's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Acadia's business, operations, and prospects as alleged herein.

164. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Acadia's financial well-being and prospects. These material

misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

165. The market for Acadia's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Acadia's securities traded at artificially inflated prices during the Class Period. On June 8, 2016, the Company's stock price closed at a Class Period high of $41.55 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Acadia's securities and market information relating to Acadia and have been damaged thereby.

166. During the Class Period, the artificial inflation of Acadia's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the

Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Acadia's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Acadia and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

167. At all relevant times, the market for Acadia's securities was an efficient market for the following reasons, among others:

(a) Acadia stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Acadia filed periodic public reports with the SEC and/or the NASDAQ;

(c) Acadia regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with

the financial press and other similar reporting services; and/or

(d) Acadia was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

168. As a result of the foregoing, the market for Acadia's securities promptly digested current information regarding Acadia from all publicly available sources and reflected such information in Acadia's stock price. Under these circumstances, all purchasers of Acadia's securities during the Class Period suffered similar injury through their purchase of Acadia's securities at artificially inflated prices and a presumption of reliance applies.

169. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material

in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

170. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Acadia who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

171. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

172. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Acadia's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

173. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Acadia's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

174. Defendants, individually and in concert, directly and indirectly, by the

use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Acadia's financial well-being and prospects, as specified herein.

175. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Acadia's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Acadia and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

176. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation,

development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

177. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Acadia's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

178. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Acadia's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Acadia's securities during the Class Period at artificially high prices and were damaged thereby.

179. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Acadia was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Acadia securities, or, if they had acquired such securities during the Class Period, they would not have done so at the

artificially inflated prices which they paid.

180. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

## Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

182. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

183. Individual Defendants acted as controlling persons of Acadia within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

184. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

185. As set forth above, Acadia and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 16, 2021

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Tamar A. Weinrib*
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
E-mail: jalieberman@pomlaw.com
E-mail: taweinrib@pomlaw.com

**POMERANTZ, LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

***Attorneys for Plaintiff***